Application for Rehearing
The original opinion in this case issued on June 30, 1981 is hereby withdrawn and the following is the opinion of the Court.
The appellant was indicted in a four-count indictment for violations of the Securities Act of Alabama. Ala. Code § 8-6-1, et seq. (1975). At arraignment on October 15, 1979, in the presence of retained counsel, he pleaded not guilty and not guilty by reason of insanity. His special plea of not guilty by reason of insanity was later withdrawn prior to trial.
The jury found appellant guilty under each count in the indictment and assessed fines against him of $2,500, $2,500, $3,000 and $5,000, respectively, for each violation in accordance with Ala. Code § 8-6-18 (a) (1975). In addition, and also in accordance with Section 8-6-18 (a), the trial court sentenced appellant to a term of three years' imprisonment in the State penitentiary under each count; said sentences to run concurrently. Appellant was further ordered by the trial court to make restitution to Mr. Charles B. Grant, Jesse W. Ortman and any other victims of his activities concerning his violation of the Securities Act.
After sentence was imposed and his motion for new trial denied, appellant gave notice of appeal. Appellant is represented by counsel of his choice, his trial counsel, on this appeal.
Omitting the formal parts, the indictment reads as follows:
 "COUNT I: The Grand Jury of said County charge that, before the finding of this indictment, JESSE E. GRADDICK, alias JAY GRADDICK, whose name is to the Grand Jury otherwise unknown, did, contrary to law, and without first having been registered as a dealer or salesman in the Office of the Securities Commission of Alabama, transact business in this State by selling or offering to sell in this State a security, to wit: a security sold or offered for sale to Charles B. Grant in the nature of a subscription or contract covering or pertaining to the sale of or purchase of beneficial interest in the profits or earnings in a proposed dog track facility in Lowndes County, Alabama, which profits, if any, were to be derived, in whole or in part, from the gambling of money at said dog track facility, in violation of Section 8-6-3 (a) of the Code of Alabama (1975), against the peace and dignity of the State of Alabama.
 "COUNT II: The Grand Jury of said County further charge that, before the finding of this indictment, JESSE E. GRADDICK, alias JAY GRADDICK, whose name is to the Grand Jury otherwise unknown, did, contrary to law, offer or sell in this State a security or securities, to wit: a security sold or offered for sale to Charles B. Grant in the nature of a subscription or contract covering or pertaining to the sale of or purchase of beneficial interest in the profits or earnings in a proposed dog track facility in Lowndes County, Alabama, the income, if any, from said security to be derived in whole or in part from the gambling of money at said proposed dog racing facility which said security or securities had not then *Page 535 
been registered by and recorded in the register of the Alabama Securities Commission, in violation of Section 8-6-4 of the Code of Alabama (1975), against the peace and dignity of the State of Alabama.
 "COUNT III: The Grand Jury of said County further charge that, before the finding of this indictment, JESSE E. GRADDICK, alias JAY GRADDICK, whose name is to the Grand Jury otherwise unknown, willfully and unlawfully in connection with the offer, sale, or purchase of a security, to wit: security in the nature of a subscription or contract covering or pertaining to the sale of or purchase of beneficial interest in the profits or earnings in a proposed dog track facility in Lowndes County, Alabama, the income to be derived from the gambling of money at such facility, did employ, directly or indirectly, a device, scheme or artifice to defraud or did make an untrue statement of a material fact as follows: That he Jesse E. Graddick, alias Jay Graddick held a financial interest in Mobile Greyhound Park; that Lowndes County officials, to wit: the county commissioners and legislators representing Lowndes County supported the said Jesse E. Graddick's venture to establish the proposed Lowndes County Dog Track; that he, Jesse E. Graddick, alias Jay Graddick, contacted all the legislators representing Lowndes County and received commitments from all legislators representing Lowndes County to support passage of a bill authorizing a local referendum on dog racing in Lowndes County; that an escrow account handled by Attorney John Parker and he, Jesse E. Graddick, alias Jay Graddick, had been established for the deposit of proceeds from the sale of securities in such proposed dog racing facility. In connection with the sale or with the offer to sell to Robert L. Prince the said security in the proposed dog track facility in Lowndes County, Alabama, Jesse E. Graddick, alias Jay Graddick, willfully omitted to state the following material facts to Robert L. Prince which were necessary in order to make the statements made in the light of the circumstances under which they were made not misleading as follows:
 "(1) that he, Jesse E. Graddick, alias Jay Graddick, had converted to his personal use proceeds or part of the proceeds from the sale to Charles B. Grant of a security granting him a right to an interest in the proposed dog track facility in Lowndes County, Alabama;
 "(2) when he stated to Robert L. Prince that three of the owners of Mobile Greyhound Park would own an interest in the said Lowndes County dog track facility the said Jesse E. Graddick, alias Jay Graddick, willfully omitted to state material facts which were necessary in order to make the statements made in light of the circumstances under which they were made, not misleading as follows: that the said group of three owners of the Mobile Greyhound Park had not presently agreed to own an interest in the said proposed Lowndes County dog track but had attached the following unfulfilled conditions to their ownership of an interest in the said proposed Lowndes County dog track; (1) that Jesse E. Graddick, alias Jay Graddick, produce a valid and lawful license authorizing the construction, operation and ownership of a dog track facility in Lowndes County, Alabama, (2) that all owners of the Mobile Greyhound Park have a right first of refusal of an interest in the said Lowndes County dog track; (3) that the owners of the Mobile Greyhound Park own a majority of the interest in the said proposed Lowndes County dog track; (4) that the owners of the Mobile Greyhound Park track exercise control over the operations of the proposed Lowndes County dog track; and (5) that the owners of the Mobile Greyhound Park know of and approve of any other owners of the proposed Lowndes County dog track and that if all of the above conditions were not met, said group of owners of Mobile Greyhound Park would not agree to own an interest in the proposed Lowndes County dog track, all in violation of Section 8-6-17 of the Code of *Page 536 
Alabama (1975), against the peace and dignity of the State of Alabama.
 "COUNT IV: The Grand Jury of said County further charge that, before the finding of this indictment, JESSE E. GRADDICK, alias, JAY GRADDICK, whose name is to the Grand Jury otherwise unknown, did, willfully and unlawfully, in connection with the offer or sale of a security, to wit: a security sold to Charles B. Grant in the nature of a subscription or contract covering or pertaining to the sale of or purchase of beneficial interest in the profits or earnings in a proposed dog track facility in Lowndes County, Alabama, the income to be derived from gambling of money at such facility, did directly or indirectly employ a device, scheme or artifice to defraud or did engage in an act, practice or course of business which operated or would operate as a fraud or deceit upon a person as follows: that said Jesse E. Graddick, alias Jay Graddick, willfully and unlawfully converted to his own personal use monies or part of the monies paid by Charles B. Grant to the said Jesse E. Graddick, alias Jay Graddick for the purchase of a right to an interest in the proposed dog track in Lowndes County, in violation of Section 8-6-17 of the Code of Alabama (1975), against the peace and dignity of the State of Alabama."
A pretrial hearing was conducted on November 14, 1979 concerning appellant's "MOTION TO QUASH THE INDICTMENT, OR IN THE ALTERNATIVE TO STRIKE SCANDALOUS MATTER." This motion was filed on October 24, 1979. Allegations five through nine and eleven of that motion, which are pertinent to this appeal, read as follows:
 "5. Defendant has been denied effective use of counsel.
 "6. Defendant has been denied effective use of counsel as guaranteed him by the Sixth Amendment to the U.S. Constitution.
 "7. The State is guilty of prosecutorial misconduct by illegally interfering with Defendant and his counsel in preparation for defense of the charges made a basis of this indictment.
 "8. The State is guilty of prosecutorial misconduct which has denied Defendant effective use of counsel as guaranteed by the Sixth Amendment to the U.S. Constitution surreptitiously illegally and covertly intercepted, by wireless communication or other mechanical or electronic device, conversations between Defendant and his attorney, which denied Defendant effective use and right of counsel as guaranteed by the Sixth Amendment to the U.S. Constitution.
 "9. The State is guilty of prosecutorial misconduct in allowing, causing and directing a potential defense witness, namely, Don Williams, to be wired for communication and sound for the purpose of transmitting conversations to a remote place for recording and listening at a time when the State knew the Defendant would be discussing his case and strategies of his case with his attorney, thereby effectively denying Defendant right of counsel as guaranteed by the Sixth Amendment to the U.S. Constitution.
. . . .
 "11. After Defendant's arrest, the State surreptitiously intercepted communications between Defendant and his attorney which denies Defendant effective use of counsel as guaranteed by the Sixth Amendment to the U.S. Constitution."
At the November 14 hearing the following information was revealed:
Don A. Williams testified that he worked as an Enforcement Agent with the ABC Board, Alcohol Narcotic Enforcement Division for the State of Alabama, in March of 1979. At that time Williams was working as an investigator in conjunction with the Montgomery District Attorney's Office. Williams was assigned to the Economic Organized Crime Unit and was working with Deputy District Attorney Walter Chandler.
Williams, in conjunction with the District Attorney's Office, conducted a surveillance of appellant on March 10, 1979. At that time Williams knew appellant had been arrested for securities violations. Williams *Page 537 
had known appellant for approximately four years. Appellant knew that Williams worked for the ABC Board as an Enforcement Agent; however, there is no evidence appellant had any idea that Williams was working in the Economic Organized Crime Unit of the District Attorney's Office.
The record[1] demonstrates clearly that, while appellant knew Williams dealt with drug operations in the law enforcement field, he considered Williams a trusted friend. Appellant certainly never suspected that Williams was investigating his case in cooperation with the District Attorney. The following exchange recorded early in Williams' March 10 conversation with appellant's attorney, Beck, and appellant makes this certain:
 "BECK: Had one of those State Troopers come to take you down — Where do you work, Don?
"WILLIAMS: I work for the State.
"BECK: _____?
"WILLIAMS: No, I work with the ABC Board.
"BECK: What do you know about this securities case?
 "WILLIAMS: (laughing) I tell you. I don't know a hell of a lot about it. Jay and I have been friends for a long time. And, uh — 'course I was working on this drug operation that we just, you know, finished up on; and I didn't know anything about, you know, what was coming down and hadn't been about to find out. _____, I'm beginning to think I'm a damn suspect 'cause ain't nobody ever talked — said a damn thing to me. And uh — 'course I ain't done nothing wrong. Other than the fact that Jay and I have been close friends for a long time, you know, and —
 "BECK: (Interrupting) Wasn't it you that took Walter Chandler to see Jay?
"WILLIAMS: Yeah, yeah.
 "BECK: Did Walter really want to buy some of this stuff?
 "WILLIAMS: Yeah, uh — that's uh — you know, he and I had talked about it.
"BECK: You and Walter?
 "WILLIAMS: Yeah, about, uh — you know that there was some stock available, and uh — Walter was representing some other people, I think, a corporation or what have you that uh — actually wanted, you know, wanted to buy it. So, I asked Jay about it, and Jay said, `Yeah,' you know. He — he'd be happy to talk with him and 'course after Jay talked to Walter he never said no more about it. He never said anything to me about it. And I've talked to Walter a lot of times since then, but it's never been brought up. So, uh — personally Walter and I —" (Emphasis added.)
Appellant had telephoned Williams the previous evening and had asked Williams to have coffee with him the following morning at the Peddler's Inn in Montgomery. Williams, as scheduled, had coffee with appellant and his friend Wilson. After coffee Williams told appellant he "had to go to the office and do some work" at which time appellant invited him to come back to his motel room when he had finished.
Williams returned to appellant's room approximately two hours later equipped with a body-mike. Williams stated that he "was almost to the room when Mr. Beck (appellant's attorney) drove up or walked up and at that time we were introduced." Wilson was also present at appellant's room. Williams did not inform appellant, Beck, or Wilson that he had the body-mike.
Williams' body-mike was equipped to transmit conversations to a recording device located in a nearby van. The van was occupied by Captain Grady Taylor and Lieutenant Bradford of the Department of Public Safety, District Attorney Jimmy Evans and Deputy District Attorney Walter Chandler. These individuals were thus able to monitor and record appellant's conversation with Beck, Wilson and Williams. At no time while Williams was in appellant's motel room did he turn off the body-mike, even though he knew Beck was appellant's *Page 538 
attorney. Williams testified that he did not know Beck would be present when he went to appellant's room. However, when asked whether he knew Beck's purpose for being there was to assist appellant in the "dog track securities issue," Williams replied, "I'm sure your purpose for being there was to assist him, yes, sir."
Williams estimated that he was in appellant's motel room approximately forty-five minutes. Williams testified that he was "acting on behalf of the State of Alabama and the District Attorney's Office" during this time. He admitted that he was not acting on behalf of appellant and that he did not participate in any defense strategy.
Williams stated that he and Wilson were asked to leave appellant's room by Beck after approximately forty-five minutes. He and Wilson continued conversing for approximately fifteen minutes until Beck and appellant came out of the room. Williams testified that he and appellant had a brief conversation, "said our farewells and I departed at that time." Williams stated that, when he left Peddler's Inn, he went to the District Attorney's Office and discussed the case with several people who were involved with the investigation.
"Defendant's Exhibit A", which is attached to the MOTION TO QUASH THE INDICTMENT, is a transcript of the conversation among appellant, Beck, Williams and Wilson as recorded on March 10, 1979 via Williams' body-mike. A review of this exhibit demonstrates clearly that certain defense strategy between appellant and Beck was discussed in Williams' presence and, thus, transmitted directly to the prosecution.
Although the defense strategy was in its initial stages of development, Williams' presence in appellant's motel room enabled the prosecution to become privy to the following information: Beck informed appellant that the "security thing" was "a pretty good case." Beck advised appellant to clear up his delinquent motel bill in Montgomery to avoid making a "splash" publicity-wise concerning a second warrant which had been issued against appellant for not paying his bill.
 "I think you ought to go ahead and pay it. Go on down there . . . if you told the guy that you was goin' pay it and he said okay . . . I'm sure ain't nobody goin' — in fact the Judge would probably throw the thing out. You sho don't need that thing hanging over your head fighting this other one. 'Cause you know, you want to see that everything is straight. Especially to the Judge 'cause this is goin' turn down almost to a legal argument as to what is securities and what isn't."
During the meeting, Beck ascertained that Williams had introduced Walter Chandler to appellant for the purpose of purchasing a percentage interest in the dog track. Beck advised that the word "stock" was a technical term and should not be used in discussing the dog track venture. Beck also learned from Williams that State Trooper Tommy Coleman "had mentioned that he would help" appellant with the "people in Lowndes County," but that appellant had never paid Williams or Coleman for their help. Appellant told Beck that attorney Ted Taylor in Prattville had heard about the dog track from a state legislator; Taylor had called Coleman and "told him he wanted in on the track." Appellant told Beck he had talked with Taylor and that Taylor had told the Grants (named in indictment) about the track. The Grants had, in turn, told Coleman they "wanted to talk — talk about the track." Appellant admitted going to the Grants with Coleman to "show 'em the agreement."
Beck also discussed with appellant his understanding of how the law on securities violation might apply:
 "BECK: Yeah. This is not security. Security law does not apply _____ now. Tell you what the tough problem you have, and that's why you talk to lawyers. There are such things as securities but they're exempt securities. They're exempt either because you offer them to less than ten people — which is primarily _____ or because of some other technicality. Primarily the number you offer makes it exempt. But to get it exempt *Page 539 
you gotta — gotta exempt it from security and even then, I think, the salesman has to be licensed. So, you got two questions. One is, is it security at all, and if it's yes it is; then you say, well, is it an exempt security? _____ and what he done to get it exempt by the law. It's still a decision of what's required to get it exempt or —
"GRADDICK: But if I wasn't soliciting, —
 "BECK: Well, that's the second part of it. If_____ securities, they still get to prove — let's just say in your offer, _____ solicitation or something like that. And, of course _____ sales, it's just really, I don't think they can charge you with sale. They may — they may try to charge you with an offer. I think the warrant — he didn't tell you — didn't show it to you, that it was sale of unregistered securities."
During the conversation Beck expressed his surprise at how quickly the prosecution had moved on appellant's case: "That's not the way Krebbs usually works. Usually they get the evidence and go to the Grand Jury." Appellant then went into the details concerning his meeting with Deputy District Attorney Walter Chandler: "the first statement I made to him, I said, `I'm not trying to sell you anything.' . . . `He said is there any interest available?' I said, `Yes, there is.' I said, however, you know, he'd have to read the agreement _____ have to be completely satisfied before it went any further." Appellant told Beck he had not solicited any sales, "I re-emphasize, I ain't gone to anybody."
The following exchange then occurred between appellant and Beck just before Williams and Wilson were asked to leave the room:
"BECK: Tommy brought the Grants to you?
"GRADDICK: Yeah.
"BECK: Don brought Walter to you?
"GRADDICK: Right.
"BECK: And Tommy brought Bob Prince to you?
 "GRADDICK: Right. Tommy brought, uh — uh, Ted Taylor to me too.
 "BECK: Did you pay or offer to pay, or tell Tommy to bring those people to you?
"GRADDICK: Nothing.
 "BECK: Ted Taylor just found out about it and got in touch with Tommy.
"GRADDICK: Right.
 "BECK: Grant, of course, found out about it, how? You know?
"GRADDICK: Tommy —
"BECK: Through Tommy.
"GRADDICK: I guess.
"BECK: Right. Tommy brought them to you?
"GRADDICK: Right.
"BECK: And Walter found out about it through Don?
"GRADDICK: Right."
Thus, there can be no question that the prosecution was privy to attorney-client conversations discussing defense strategy and, through Williams, was able to disgorge other valuable information relevant to the prosecution of the appellant's case.
Robert L. Prince, Deputy Director of the Alabama Securities Commission, also testified at the November 14, 1979, pretrial hearing on appellant's MOTION TO QUASH THE INDICTMENT, but his testimony was not relevant to the prosecutor's interception of the March 10 private conversation among Beck, appellant, Williams and Wilson.
Following Mr. Prince's testimony and cogent argument by defense counsel, the trial court denied appellant's motion.
Appellant's trial proceeded on the merits on January 22, 1980. The State called twenty-eight witnesses over appellant's four-day trial, including Ted Taylor, Charles Grant, Walter Chandler, Tommy Coleman and members of the Alabama Legislature. The testimony of these witnesses, alone, was greatly damaging to appellant's case. At the conclusion of the State's evidence, and following appellant's motion to exclude, appellant rested without presenting any defense. *Page 540 
Appellant contends that the trial court committed reversible error in denying his motion to quash the indictment. Appellant alleges that prosecutorial eavesdropping of defense strategy between him and his attorney denied him effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution. On review of well reasoned authority in this area, and based on the particular facts at bar, we agree.
Undeniably, the two most frequently mentioned cases discussing eavesdropping on attorney-client conversations areCoplon v. United States, 89 U.S.App.D.C. 103, 191 F.2d 749
(1950), and Caldwell v. United States, 92 U.S.App.D.C. 355,205 F.2d 879 (1953). See Weatherford v. Bursey, 429 U.S. 545,97 S.Ct. 837, 51 L.Ed.2d 30 (1977); Hoffa v. United States,385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); United States v.Zarzour, 432 F.2d 1 (5th Cir. 1970); United States v. Peters,468 F. Supp. 364 (S.D.Fla. 1979); United States v. Orman,417 F. Supp. 1126 (D.Colo. 1976).
In Coplon, a celebrated espionage case, the defendant was convicted of furnishing secret United States intelligence reports to a Russian agent, and it was learned that after she was arrested, her telephone conversations with her lawyer were monitored. The D.C. Court of Appeals held that there was presumed prejudice which required a reversal.[2]
 "We think the District Court erred in holding that the interception of telephone messages between appellant and her counsel before and during her trial, if it occurred, was nothing more than a serious breach of ethics unless such interception yielded evidence which was introduced against her. It is true, as the court pointed out, that § 605 of the Communications Act, as construed by the Supreme Court, does not make wiretapping an offense but does condemn as criminal the interception and disclosure of the contents of the message, both acts being essential to complete the offense. But that is not analogous to the Fifth and Sixth Amendments, which unqualifiedly guard the right to assistance of counsel, without making the vindication of the right depend upon whether its denial resulted in demonstrable prejudice. The Supreme Court said in Glasser v. United States, 1942, 315 U.S. 60, 76, 62 S.Ct. 457, 467, 86 L.Ed. 680: `* * * The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial.'
 "We think it is further true that the right to have the assistance of counsel is so fundamental and absolute that its denial invalidates the trial at which it occurred and requires a verdict of guilty therein to be set aside, regardless of whether prejudice was shown to have resulted from the denial. In the Glasser case, having held that the trial court `denied Glasser his right to have the effective assistance of counsel, guaranteed by the Sixth Amendment,' the Supreme Court said: `This error requires that the verdict be set aside and a new trial ordered as to Glasser.'" Coplon, 191 F.2d, at 759
In Caldwell the Government employed an agent to invade the "defense camp." The Government agent managed to get himself employed by the defendant's attorney to aid in the defense of Caldwell. Being so employed the agent became privy to confidential attorney-client communications. These communications were then conveyed to the Assistant U.S. Attorney.[3]
 "On these basic facts, so stated, we think our decision in the Coplon v. U.S. case is controlling. We there held flatly that `The prosecution is not entitled to have a representative present to hear the conversations of accused and counsel.' More specifically, we held that interception of supposedly private telephone consultations between accused and counsel, before and during trial, denies the accused his *Page 541 
constitutional right to effective assistance of counsel, under the Fifth and Sixth Amendments. And the denial `invalidates the trial at which it occurred and requires a verdict of guilty therein to be set aside, regardless of whether prejudice was shown to have resulted from the denial.' We see no reason why intrusion by means of wiretapping should be differentiated from intrusion by means of secret agents. In neither instance, we think, need actual prejudice be shown in order to entitle defendant to a new trial. "We do not mean to deny the right — indeed the duty — of prosecuting officials to seek to uncover, prosecute and punish resort by accused persons and their counsel to theft of files or other unlawful means of defense. We recognize that the prosecutor in this case was faced with a real dilemma, once the possibility of a theft of the files had been reported by Bradley. We do not question that he then acted with what must have seemed high motives, and certainly with active diligence. But high motives and zeal for law enforcement cannot justify spying upon and intrusion into the relationship between a person accused of crime and his counsel. The Constitution's prohibitions against unreasonable searches, and its guarantees of due process of law and effective representation by counsel, lose most of their substance if the Government can with impunity place a secret agent in a lawyer's office to inspect the confidential papers of the defendant and his advisers, to listen to their conversations, and to participate in their counsels of defense. Conduct of that sort on the part of our Government is no doubt extremely rare. But if it does occur a conviction tainted by it cannot stand. Appellant's motion for a new trial should have been granted." Caldwell, 205 F.2d, at 881.
The United States Supreme Court characterized the Government's actions in Coplon and Caldwell as "intrusion of the grossest kind upon the confidential relationship between the defendant and his counsel." Hoffa, 385 U.S., at 306,87 S.Ct., at 416.
In Hoffa, there were two trials, the first of which ended with a hung jury. The second trial resulted in a conviction for jury tampering in the hung jury case [the Test Fleet trial]. Hoffa wanted to have his jury tampering conviction reversed because of intrusion into the attorney-client relationship during the Test Fleet trial, although there was no claim of attorney-client intrusion in the case in which he was convicted.[4] The Supreme Court refused to reverse, and it was said:
 "We may assume that the Coplon and Caldwell cases were rightly decided, and further assume, without deciding, that the Government's activities during the Test Fleet trial were sufficiently similar to what went on in Coplon and Caldwell to invoke the rule of those decisions. Consequently, if the Test Fleet trial had resulted in a conviction instead of a hung jury, the conviction would presumptively have been set aside as constitutionally defective. Cf. Black v. United States, ante, [385 U.S.] p. 26 [87 S.Ct. p. 190, 17 L.Ed.2d p. 26].[5]
 "But a holding that it follows from this presumption that the petitioner's conviction in the present case should be set aside would be both unprecedented and irrational. In Coplon and in Caldwell, the Court of Appeals held that the Government's intrusion upon the defendant's relationship with his lawyer `invalidates the trial at which it occurred.' . . . In both of those cases the court directed a new trial, and the second trial in Caldwell resulted in a conviction which this Court declined to review . . . The argument here, therefore, goes far beyond anything decided in Caldwell or in Coplon. For if the petitioner's argument were accepted, not only could there have been no new conviction on the existing charges in Caldwell, but not even a conviction on *Page 542 
other and different charges against the same defendant.
 "It is possible to imagine a case in which the prosecution might so pervasively insinuate itself into the councils of the defense as to make a new trial on the same charges impermissible under the Sixth Amendment. But even if it were further arguable that a situation could be hypothesized in which the Government's previous activities in undermining a defendant's Sixth Amendment rights at one trial would make evidence obtained thereby inadmissible in a different trial on other charges, the case now before us does not remotely approach such a situation." Hoffa, 385 U.S. 307, 308, 87 S.Ct., 416.
In Weatherford, a pivotal Supreme Court opinion to any discussion concerning whether or not eavesdropping by a government agent into an attorney-client conversation is in violation of the Sixth Amendment, the Court focused on certain of its former rulings, eluminating in particular its holding inHoffa, and laid down certain guidelines which we now follow in the present case. In Weatherford, the Supreme Court was asked to determine whether the presence of an undercover police officer at a strategy meeting between a defendant and his counsel amounted to a constitutional violation. The police officer, when in fact invited by the defendant, attended exclusively for the purpose of preserving his undercover identity and did not relate anything that he had heard duringthe course of the meeting to the prosecution. The Court of Appeals for the Fourth Circuit in reversing the defendant's conviction concluded that "whenever the prosecution knowingly arranges or permits intrusion into the attorney-client relationship the right to counsel is sufficiently endangered to require reversal and a new trial." Bursey v. Weatherford,528 F.2d 483, 486 (4th Cir. 1975). The Supreme Court reversed, rejecting the Fourth Circuit's per se rule, reasoning that every intrusion into the attorney-client relationship was not necessarily violative of the Sixth Amendment right to counsel. The Court's decision, however, was a narrow one. The Supreme Court carefully delineated the scope of its holding. UnitedStates v. Levy, 577 F.2d 200, 209 (3rd Cir. 1978).
In rejecting the Fourth Circuit's per se rule, the Court first focused on Black v. United States, 385 U.S. 26,87 S.Ct. 190, 17 L.Ed.2d 26 (1966), and O'Brien v. United States,386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967), two cases involving surreptitious electronic surveillance by the Government which was plainly illegal under the Fourth Amendment. In considering the inapplicability of Black andO'Brien to the facts in Weatherford v. Bursey, the Court wrote:
 "If anything is to be inferred from these two cases with respect to the right of counsel, it is that when conversations with counsel have been overheard, the constitutionality of the conviction depends on whether the overheard conversations have produced, directly or indirectly, any of the evidence offered at trial." 429 U.S., at 552, 97 S.Ct. at 842.
The Court in Weatherford then discussed its holding in Hoffa.
After repeating the basic facts in Hoffa Justice White wrote:
 "[T]he Court did not hold that the Sixth Amendment right to counsel subsumes a right to be free from intrusion by informers into counsel-client consultations. Nor did it purport to describe the contours of any such right. The Court merely assumed, without deciding, that . . . (Caldwell and Coplon)
were correctly decided; assumed without deciding, that had Hoffa been convicted at his first trial, the conviction would have been set aside because the informer had overheard Hoffa and his lawyers conversing and had reported to the authorities the substance of at least some of those conversations. . . ." 429 U.S., at 553, 97 S.Ct. at 842-43.
Justice White then provides certain factors, which we can use as guidelines, that would have given Bursey a stronger case for reversal:
 [W]e need not agree with petitioners that whenever a defendant converses with his counsel in the presence of a third party thought to be a confederate and ally, the *Page 543 
defendant assumes the risk and cannot complain if the third party turns out to be an informer for the government who has reported on the conversations to the prosecution and who testifies about them at the defendant's trial. Had Weatherford testified at Bursey's trial as to the conversation between Bursey and Wise: had any of the State's evidence originated in these conversations; had those overheard conversations been used in any other way to the substantial detriment of Bursey; or even had the prosecution learned from Weatherford, an undercover agent, the details of the Bursey-Wise conversations about trial preparations, Bursey would have a much stronger case.
 "None of these elements is present here, however. Weatherford's testimony for the prosecution about the events of March and April 1970 revealed nothing said or done at the meeting between Bursey and Wise that he attended. None of the State's evidence was obtained as a consequence of Weatherford's participation in those meetings. Nevertheless, it might be argued that Weatherford, a dutiful agent, surely communicated to the prosecutors Bursey's defense plans and strategy and his attorney's efforts to prepare for trial, all of which was inherently detrimental to Bursey, unfairly advantaged the prosecution, and threatened to subvert the adversary system of criminal justice.
 "The argument founders on the District Court's express finding that Weatherford communicated nothing at all to his superiors or to the prosecution about Bursey's trial plans or about the upcoming trial. . . ." 429 U.S., at 554-556, 97 S.Ct. at 843-844.
In short, Justice White concluded: "There being no tainted evidence in this case, no communication of defense strategy of the prosecution, and no purposeful intrusion by Weatherford, there was no violation of the Sixth Amendment insofar as it is applicable to the States by virtue of the Fourteenth Amendment." 429 U.S., at 558, 97 S.Ct. at 845.
The facts in the instant case are far different from those inWeatherford. While Williams did not testify during appellant's trial, the other factors, which would give the accused a "stronger case," that are set out in Weatherford are clearly present. (1) At least some of the State's evidence could have originated in the Beck-appellant conversation Williams was privy to. (2) While the exact extent of harm cannot be known, the overheard conversation very likely was used to the substantial detriment of appellant by the State. (Certainly, the overheard conversation could not have been advantageous or even innocuous to appellant — the conversation was not
"confined to the weather or other harmless subjects."429 U.S., at 558, 97 S.Ct. at 845.) (3) The prosecution not only learned from Williams, but heard as Williams heard, the details of the Beck-appellant conversation about trial preparation.
Footnote four in Weatherford, supra, is helpful in distinguishing the injury which is caused through mere third party presence in the attorney-client communications from the injury which results through electronic eavesdropping:
 "One threat to the effective assistance of counsel posed by government interception of attorney-client communications lies in the inhibition of free exchanges between defendant and counsel because of the fear of being overheard. However, a fear that some third party may turn out to be a government agent will inhibit attorney-client communication to a lesser degree than the fear that the government is monitoring those communications through electronic eavesdropping, because the former intrusion may be avoided by excluding third parties from defense meetings or refraining from divulging defense strategy when third parties are present at those meetings. Of course, in some circumstances the ability to exclude third parties from defense meetings may not eliminate the chilling effect on attorney-client exchanges, but neither Hoffa nor any other decision of this Court supports respondent's theory that the chill is the same whether induced by *Page 544 
electronic surveillance or by undercover agents." 429 U.S., at 554, 555, 97 S.Ct. at 843.
Here, appellant received simultaneously the worst from both types of eavesdropping. Williams became privy to the Beck-appellant conversation by his presence while, at the same time, the prosecutors became privy to that same conversation through electronic surveillance via Williams' body-mike. Furthermore, according to Williams' testimony, after participating in the conversation, Williams met at the District Attorney's Office and talked with those persons investigating the appellant's case. Unlike the facts in Weatherford, the prosecution in this case knew everything their undercover agent knew. The information possessed by Williams did not remain "uncommunicated." There can be no question here that Williams' presence in appellant's room was directly responsible for the "chilling effect on attorney-client exchanges" discussed in footnote four of Weatherford.
Also, it cannot be seriously contended that Williams did not go to appellant's room to spy.[6] While Williams did go to appellant's room at invitation, and claimed that he was unaware Beck would be there, the conclusion is inescapable that he did not go there to do anything but spy on appellant's activities and gain information. Why else would one be equipped with a body-mike and have a nearby van occupied by prosecutors possessed of sophisticated monitoring and recording devices except to spy? There could have been no other reason for such blatant conduct.
That Williams went to appellant's room "by invitation" does not help the State's case. The Sixth Amendment protects attorney-client communications. Glasser v. United States,315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The Fourth Amendment protects against unwarranted intrusions. O'Brien, supra; Black, supra; Silverman v. United States, 365 U.S. 505,81 S.Ct. 679, 5 L.Ed.2d 734 (1961).
Furthermore, that Williams did not know Beck would be present does not serve to weaken appellant's Sixth Amendment protection. According to Chief Judge Urbom's analysis in UnitedStates v. Cooper, 397 F. Supp. 277, 285 (D.Neb. 1975):
 "If a government informant (1) gains information (2) relating to a charge then pending or being investigated (3) from overhearing conversations by counsel expected to be confidential, and (4) the information is divulged before or during trial on that charge to the counsel handling the prosecution of that charge, then there has been a violation of the defendant's Sixth Amendment right to counsel and a new trial is necessary if conviction has followed the divulging. . . ."
Even if we assume that the prosecution had no knowledge that Beck would be present at the meeting and that this fact could somehow strengthen the State's case, such assumption loses any significance it might have had because of Williams' testimony that he met Beck when Beck "was almost to the room" and that he knew Beck's "purpose for being there was to assist" appellant. Williams never once offered to excuse himself, but continued fervently in his ploy to deceive appellant and Beck by professing his friendship with appellant. Nor were the monitoring and recording devices located in the van turned off; the transcript of the conversation is proof of that. Clearly, a Sixth Amendment violation occurred. In this case there was an actual gaining, rather than a mere opportunity for gaining, of information relative to a charge against appellant. Levy, 577 F.2d, at 207. Each element in the Cooper analysis was fully satisfied.
It should be pointed out at this point that Weatherford
neither suggests nor requires a test of actual or demonstrable prejudice in determining a violation of Sixth Amendment rights.Levy, 577 F.2d, at 209. Judge Gibbons writing for the Third Circuit in Levy, states: *Page 545 
 "We think that the Court (in Weatherford) was suggesting by negative inference that a sixth amendment violation would be found where, as here, defense strategy was actually disclosed or where, as here, the government enforcement officials sought such confidential information. Whether or not that negative inference was intended, the Court certainly did not lay down a rule that when actual disclosure occurred, additional prejudice still must be found. Thus we are at least free to decide on policy grounds whether such a rule would be desirable. As we indicated above, we think that such a rule would be highly undesirable." (Emphasis added.) 577 F.2d, at 210.
Judge Gibbons had considered the question of prejudice earlier in Levy. There, he writes:
 "Where there is a knowing invasion of the attorney-client relationship and where confidential information is disclosed to the government, we think that there are overwhelming considerations militating against a standard which tests the sixth amendment violation by weighing how prejudicial to the defense the disclosure is. In this case a government attorney, sensitive to her obligation to prevent sixth amendment violations by agents of the United States, called the matter to the district court's attention. Consequently, the court was able to consider the problem in a pretrial hearing. But it is highly unlikely that a court can, in such a hearing, arrive at a certain conclusion as to how the government's knowledge of any part of the defense strategy might benefit the government in its further investigation of the case, in the subtle process of pretrial discussion with potential witnesses, in the selection of jurors, or in the dynamics of trial itself. . . .
 "Of course, the difficulties to which we refer could be obviated by a sufficiently severe definition of prejudice. For example, we could hold, by analogy to fourth amendment case law, that no prejudice occurs unless it is shown that some of the government's evidence would have been unknown to it, and thus unavailable, except for the disclosure of a confidence. Cf. Wong Sun v. United States, 371 U.S. 471, 487-88, 83 S.Ct. 407 [417-18] 9 L.Ed.2d 441
(1963); Government of Virgin Islands v. Gereau, 502 F.2d 914, 927-28 (3d Cir. 1974). The analogy is not a good one, however, for the interests at stake in the attorney-client relationship are unlike the expectations of privacy that underlie the fourth amendment exclusionary rule. The fundamental justification for the sixth amendment right to counsel is the presumed inability of a defendant to make informed choices about the preparation and conduct of his defense. Free two-way communication between client and attorney is essential if the professional assistance guaranteed by the sixth amendment is to be meaningful. The purpose of the attorney-client privilege is inextricably linked to the very integrity and accuracy of the fact finding process itself. Even guilty individuals are entitled to be advised of strategies for their defense. In order for the adversary system to function properly, any advice received as a result of a defendant's disclosure to counsel must be insulated from the government. No severe definition of prejudice, such as the fruit-of-the-poisonous-tree evidentiary test in the fourth amendment area, could accommodate the broader sixth amendment policies. We think that the inquiry into prejudice must stop at the point where attorney-client confidences are actually disclosed to the government enforcement agencies responsible for investigating and prosecuting the case. Any other rule would disturb the balance implicit in the adversary system and thus would jeopardize the very process by which guilt and innocence are determined in our society. In the instant case confidential information was disclosed to the government authorities." (Emphasis added.) 577 F.2d, at 208, 209.
The Third Circuit Court of Appeals in United States v.Morrison, 602 F.2d 529, 532 (3rd Cir. 1979), reversed on other grounds, *Page 546 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981) again decided that the holding in Weatherford "was not broad enough to support the interpretation . . . that mere failure to gain evidence or tactical advantage from an intrusion (into attorney-client communications) bars any finding of sixth amendment violation." As Chief Judge Urbom wrote in Cooper:
 "It makes sense to me that no prejudice needs to be shown as a prerequisite to a new trial if overheard confidential communications between a defendant and his counsel or conversations of counsel about the defendant's case are within the knowledge of the prosecuting attorney at the time of trial. The dangers of subtle use by the prosecutor of the information from the conversation either evidentially or strategically, are obvious." (Emphasis added.) 397 F. Supp., at 284.
In the case at bar it is impossible to ascertain the exactamount of tactical advantage the State gained from the Williams intrusion into the Beck-appellant conversation. Defense strategy was definitely discussed and damaging information to appellant's case came out during the meeting. To what extent
appellant was actually prejudiced by the intrusion can never be known with certainty. However, that question need not be decided in determining a violation of Sixth Amendment rights. In accordance with Levy, our inquiry into prejudice must stop at the point where attorney-client confidences are actually disclosed to the government enforcement agencies responsible for investigating and prosecuting the case.
Based on the foregoing principles of law we have little difficulty in concluding that an impermissible invasion of the attorney-client relationship has occurred. Appellant's Sixth Amendment rights were clearly violated by the State. What remains is to fashion a remedy. There exists a paucity of judicial treatment of this particular type of Sixth Amendment violation to assist the court in arriving at an appropriate remedy. Peters, 468 F. Supp., at 366, and cases cited therein. Basically, the two forms of relief are to reverse and remand for a new trial, or to reverse and remand for an order dismissing the indictment.
In cases where the attorney-client relationship has been violated and confidential information has been unlawfully disclosed to the government, the most recent cases have found dismissal of the indictment to be the only viable solution.Levy; Peters; Orman. Even Caldwell and Hoffa recognize that under extreme circumstances dismissal of the indictment may be the only solution. We find the reasoning of the Court in Statev. Cory, 62 Wn.2d 371, 382 P.2d 1019, 5 A.L.R.3rd 1352 (1963) persuasive in deciding this issue:
 "We do not think, however, that the granting of a new trial is an adequate remedy for the deprivation of the right to counsel where eavesdropping has occurred. So far as the opinion in the Coplon case reveals, the defendant did not ask that the case be dismissed, but merely urged that she be granted a new trial. In the Caldwell case, a footnote indicates that the opinion of the court was that a dismissal would not be proper unless the defendant could show that the invasion of his right to private consultation was so prejudicial that a subsequent trial necessarily would be unfair. In effect, the court in that case said that it was not necessary for the defendant to show that he had been prejudiced in the first trial, in order to secure a second trial, but that it would be necessary to show that he would also be prejudiced in a second trial, in order to secure a dismissal.
 "We do not appreciate the logic of this conclusion. There is no way to isolate the prejudice resulting from an eavesdropping activity, such as this. If the prosecution gained information which aided it in the preparation of its case, that information would be as available in the second trial as in the first. If the defendant's right to private conversation has been interfered with once, that interference is as applicable to a second trial as to the first. And if the investigating officers *Page 547 
and the prosecution know that the most severe consequence which can follow from their violation of one of the most valuable rights of a defendant, is that they will have to try the case twice, it can hardly be supposed that they will be seriously deterred from indulging in this very simple and convenient method of obtaining evidence and knowledge of the defendant's trial strategy.
. . . .
 "It is morally incongruous for the state to flout constitutional rights and at the same time demand that its citizens observe the law.
 "This concept of how the judiciary should react to violation of constitutional rights, appeals to us."
Thus, the indictment in Cory was dismissed.
In dismissing the defendant's indictment in Levy it was held:
 "Since in this case an actual disclosure of defense strategy occurred and since we reject the proposed rule that the damage done by such disclosure should be weighed on a case-by-case basis, we must consider what remedy is appropriate. In our judgment, the only appropriate remedy is the dismissal of the indictment. . . . The disclosed information is now in the public domain. Any effort to cure the violation by some elaborate scheme, such as by bringing in new case agents and attorneys from distant places, would involve the court in the same sort of speculative enterprise which we have already rejected. Even if new case agents and attorneys were substituted, we would still have to speculate about the effects of the old case agents' discussion with key government witnesses. More important, public confidence in the integrity of the attorney-client relationship would be ill-served by devices to isolate new government agents from information which is now in the public domain. At least in this case, where the trial has already taken place, we conclude that dismissal of the indictment is the only appropriate remedy. We need not decide whether dismissal would be required when the defense strategy has been disclosed to government agents but has not become public information." 577 F.2d, at 210.
On review of these authorities we conclude that dismissal of the indictment is the only viable remedy. It would be sheer speculation to hold that the prejudice done to appellant by the prosecution's eavesdropping on his conversation with Beck could possibly be cured in a second trial. As Justice Brandeis so eloquently stated in Olmstead v. United States, 277 U.S. 438,48 S.Ct. 564, 72 L.Ed. 944 (1942):
 "Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizens. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means — to declare that the government may commit crimes in order to secure the conviction of a private criminal — would being terrible retribution. Against that pernicious doctrine this court should resolutely set its face."
We recognize that in United States v. Morrison, 449 U.S. 361,101 S.Ct. 665, 66 L.Ed.2d 564 (1981) the Supreme Court held that dismissal of the indictment was inappropriate where the violation of the defendant's Sixth Amendment rights had no adverse impact upon the criminal proceedings: "More particularly, absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate."
However, the "substantial threat" of prejudice resulting from the unlawful disclosure of defense strategy to the government obtained in violation of the attorney-client *Page 548 
confidential relationship is obvious, definite and apparent.
Morrison did not involve a similar factual situation to the case at bar and in Morrison there was no allegation or showing that the violation of the defendant's Sixth Amendment rights had prejudiced the quality or effectiveness of the defendant's legal representation. We do not think that the "taint" of the violation of the appellant's Sixth Amendment rights can be "neutralized" under the facts of this case.
The judgment of conviction in this case cannot stand in the light of the foregoing authorities.
The judgment of the lower court is reversed and the judgment is here rendered discharging the defendant.
REVERSED AND RENDERED.
Opinion Substituted; Application for Rehearing Overruled.
All the Judges concur.
[1] Defendant's Exhibit A, which is attached to Defendant's MOTION TO QUASH THE INDICTMENT. This exhibit is discussed more fully later in the opinion.
[2] United States v. Orman, 417 F. Supp. 1126, 1134 (D.Colo. 1976).
[3] United States v. Peters, 468 F. Supp. 364, 366 (S.D.Fla. 1979).
[4] Orman, 417 F. Supp., at 1134, 1135
[5] Black v. United States, 385 U.S. 26, 87 S.Ct. 190,17 L.Ed.2d 26 (1966).
[6] In Weatherford the Court placed some amount of emphasis on the fact that Weatherford did not go to spy, but went at the defendant's invitation to avoid raising the suspicion that he was an informant.