The appellant was indicted and charged with two counts of theft by deception, and six counts of violations of the State Ethics Law, specifically that he used his official position to obtain for himself direct personal financial gain, in violation of § 36-25-5, Code of Alabama 1975. A mistrial was initially declared by the trial court on the grounds that the appellant had tampered with the jury panel, and the appellant was cited with contempt. Thereafter, following another trial, the jury found the appellant guilty on all counts. The appellant was sentenced to 10 years' imprisonment and was ordered to pay $50,000 restitution.
Because the issue of the sufficiency of the evidence to support the appellant's convictions of theft by deception and the violation of the State Ethics Law is raised by the appellant, a brief rendition of the facts must be recounted. The appellant took office as the mayor of the City of Vernon, Alabama, in October 1988, and continued in that office in 1989 and 1990. During that *Page 102 
period, agents with the Northwest Alabama Mental Health Center, Inc. (hereinafter the "Mental Health Center"), approached Banks Butler, a member of the Vernon Industrial Development Board and the owner of a retail business located on property adjacent to the Mental Health Center's office in Vernon, about the purchase of some property. The Mental Health Center is a public corporation that operates mental health facilities and provides mental health services in an area including Lamar County. The Mental Health Center was seeking property on which to construct certain residential facilities. Butler told one of the agents of the Mental Health Center about a vacant lot that he owned, and the agent looked at the property, indicating that it appeared suitable for the Mental Health Center's purposes. The agent told Butler that the project would be paid for with federal funds, and Butler told him that the property was available for $6,000. Some adjacent property, known as the Livingston estate, was discussed, and Butler informed the agent that this property had previously been offered for $32,000. The men discussed some work that would have to be done on the Livingston estate, in order to make it suitable, and the agent expressed some interest in purchasing that property. Thereafter, Butler spoke with the appellant concerning the work that needed to be done on the Livingston estate, and the appellant stated that the city would cooperate in any way that it could. When he heard nothing else about the purchase of the property, Butler called the agent, who informed him that the matter had been postponed, because the money for it had not been approved.
In early fall 1989, the head of the Mental Health Center attended a meeting of the Vernon City Council. During this meeting, the head of the Mental Health Center discussed the possibility of locating group homes in Vernon, and the possibility of purchasing the Livingston estate. Both the head of the Mental Health Center and the appellant informed the city council that the Mental Health Center would make the decision concerning the property it would purchase.
Thereafter, the head of the Mental Health Center discussed his interest in building the facility in Vernon with a probate judge from Lamar County. The judge thought the project sounded beneficial to the area, and the two men then met with the appellant on several occasions concerning the matter. The probate judge recommended to the Lamar County Commission that it appropriate $25,000 for the purchase of the property, if it was legal to do so. Although it is unclear whether the judge or Banks Butler contacted an attorney, a letter appears in the record in which an attorney states that it was legal for the county commission to appropriate funds for that purpose. Butler testified that he had told this attorney that the sale of the property would not include any local funds, and that all the money to be used for the purchase was to be provided by federal funds.
In the spring of 1990, Banks Butler was approached by the appellant, who told Butler that the Mental Health Center project had finally come through, but that there was one problem. The appellant told Butler that the property that the Mental Health Center was interested in purchasing was owned by the appellant. He then asked Butler if Butler would act as real estate agent for six percent commission. The appellant told Butler that he would sell the property to Butler and that Butler could then sell the property to the Mental Health Center. Butler testified that the appellant told him that the project was to be built with federal funds and that it would create approximately 43 jobs. The appellant also told Butler of a mortgage on the property secured by a $12,500 note and suggested that, upon payment by the Mental Health Center, Butler should pay off that note. Thereafter, a deed transferring the property from the appellant to Butler was prepared by Butler's daughter. The property was deeded to Butler in return for $10 and other valuable consideration. The price for the lot was set by the appellant at $50,000. The deed was backdated, and Butler's daughter testified that she backdated the deed at the appellant's request. *Page 103 
However, the appellant denied making this request.
On March 26, 1990, the Lamar County Commission adopted a resolution appropriating $25,000 to the Mental Health Center in order to help purchase land for a mental health facility in Vernon, Alabama. Apparently no particular land was mentioned at this meeting.
On April 2, 1990, the Vernon City Council voted to appropriate $25,000 to the Mental Health Center for acquisition of the land in Vernon, Alabama. During this meeting, the appellant told the council that the project would include the building of 2 homes for adults and 1 for children, and that these facilities would provide space for 44 people and would create that number of jobs. He further told the city council that the Mental Health Center was requesting a donation of $50,000 for the purchase of land and that the Lamar County Commission had already agreed to contribute $25,000. With the exception of one member who voted against the resolution and one member who abstained, every member of the city council voted for the appropriation of funds. The minutes, included in the record, indicate that the appellant also voted for the appropriation.[1] Each member of the city council testified that the appellant never informed the council that he owned the property being considered. On April 12, 1990, Butler met with the head of the Mental Health Center, who gave Butler a check for $50,000, and, in return, Butler delivered the deed to the property. Butler deposited the check into his business account and wrote a check for $13,100 to pay off the lien. He also paid off the note held by the Bank of Vernon for $12,500. He kept a six percent commission and paid the remainder, which was $21,163.10, to the appellant.
Every city council member testified at trial that, had they known that the property belonged to the appellant, they never would have voted to appropriate the funds, because the purchase violated the State Ethics Law in that the appellant realized personal gain from the purchase of the property. Evidence was also presented of the existence of a title opinion showing that the appellant's title to the property was good.
The appellant presented evidence that the Livingston estate was determined to be unsuitable for the Mental Health Center's purpose because it was located partially in a flood plain. During the cross-examination, the head of the Mental Health Center, who testified for the defense, stated that on March 22, 1990, when the appellant first told him of the availability of the property, he had told him that this property was owned by Banks Butler. The witness further testified that he was never given any indication that the land being considered belonged to anyone other than Banks Butler. The witness testified that after acquiring the deed, he had a survey done, which verified that he had received the land that he "had bargained for."
The appellant testified that after the Livingston estate was rejected as a location for the residential facility, the head of the Mental Health Center insisted on seeing some other property.[2] The appellant then took the head of the Mental Health Center to his property, and the head of the Center stated that the property was perfect for the Mental Health Center's needs. The appellant testified that he was never asked who owned the property and that he never informed the head of the Mental Health Center that he owned the property. He testified that he approached Butler about handling the sale of the property because the agents of the Mental Health Center had originally approached Butler. The appellant further testified that he talked to Butler about the arrangements for conveying his property to Butler and ultimately selling the property to the Mental Health Center. He suggested that Butler talk to his lawyer about the legality of doing this. He was later informed by Butler that he had *Page 104 
spoken to his attorney and that the process would be legal. The appellant testified that he had owned the property that was conveyed to the Mental Health Center since 1948, and that he did not gain anything from the sale. He testified that, based on sales within the last five years of land adjacent to this land, he had actually lost $28,000 on the sale.
 I
The appellant argues that the evidence presented by the State to support his conviction for theft of property by deception was insufficient. The appellant argues that, although the State presented ample evidence to support the element of deception, the State has failed to prove any evidence of theft.
Theft of property is defined in § 13A-8-2, Code of Alabama
1975, as follows:
 "A person commits the crime of theft of property if he:
 "(1) Knowingly obtains or exerts unauthorized control over the property of another, with intent to deprive the owner of his property; or
 "(2) Knowingly obtains by deception control over the property of another, with intent to deprive the owner of his property."
Theft of property in the first degree involves property that exceeds $1,000 in value or property of any value taken from the person of another.
In the present case, the appellant was charged with theft by deception, as defined in § 13A-8-2(2). A number of means of deception, which are encompassed in offenses involving theft, are set out in § 13A-8-1, Code of Alabama 1975. Most of these definitions are applicable in the present case.[3] Those pertinent to this case are:
 "a. Creates or confirms another's impression which is false and which the defendant does not believe to be true; or
 "b. Fails to correct a false impression which the defendant previously has created or confirmed; or
 "c. Fails to correct a false impression when the defendant is under a duty to do so; or
 "d. Permits another from acquiring information pertinent to the disposition of the property involved; or
 "e. Sells or otherwise transfers or encumbers property, failing to disclose a lien, adverse claim or other legal impediment to the enjoyment of the property when the defendant is under a duty to do so, whether that impediment is or is not valid, or is not a matter of official record." (Emphasis added.)
The appellant's deception was apparent by his conduct, which was in violation of the State Ethics Law, that is, by using his position as mayor to promote the appropriation of public funds for the purchase of his property, the purchase price of which was set by the appellant. This deception included failing to inform the city council and head of the Mental Health Center that the property in question was his own. He solicited and secured a straw man and had the deed backdated in order to give an air of legality to the transaction. Furthermore, he informed Banks Butler that the money that was being provided to the Mental Health Center to purchase the property was from federal funds, after this funding had been denied, before telling him to seek the advice of counsel as to the legality of the transaction. The appellant promoted the project and the appropriation of funds by the city for the project, without disclosing his position as owner of the property. All the city council members testified that they would not have voted for the appropriation of the funding had they known that the appellant owned the property.
 "It is a well-settled principle of the law of fraud, applied particularly by courts of equitable jurisdiction, that it is the duty of a person in whom confidence is reposed by virtue of the situation of trust arising out of a confidential or fiduciary relationship, to make a full disclosure of any and all material facts within his knowledge relating to a contemplated transaction with the other party to such *Page 105 
 relationship, and any concealment or failure to disclose such facts is fraud. While this principle was developed by the Chancellors in early cases, it is now universally recognized. Not only does the duty of disclosure arise where there is a fiduciary relationship in the strict sense of the term, but also where one person stands in a fiduciary capacity to another or is in a position to have and to exercise, and does actually exercise, influence over another who reposes confidence in him. Where a confidential relationship exists between the parties to a transaction, there is no privilege of nondisclosure, and if a party to the relationship fails to make full disclosure of all material facts, the nondisclosure has the affect of a material misrepresentation."
37 Am.Jur.2d Fraud and Deceit § 149.
However, while the appellant clearly "knowingly obtain[ed] by deception control over the property of another," there is no evidence that the appellant intended to deprive the owner of his property. The record indicates that, in return for the $50,000, the appellant's property was deeded over to the Mental Health Center. There was also evidence that the Mental Health Center received the property it bargained for and that the title to the property was good. There was evidence that the city council and county commission were aware that the Mental Health Center would make the decision as to what property it would purchase. The record also indicates that on July 6, 1990, two months after the appellant was arrested and pleaded not guilty to the present offense, the property was deeded from the Mental Health Center to the Lamar County district attorney, as trustee for the City of Vernon, Alabama, and Lamar County, Alabama, for $10 and other valuable consideration. The deed contains the following language:
 "And said Northwest Alabama Mental Health Center, a Public Corporation, does for itself, its successors and assigns, covenant with P.M. Johnston, District Attorney of the 24th Judicial Circuit, as the Trustee for the City of Vernon, Alabama and Lamar County, Alabama, his successors and assigns, that it is lawfully seized in fee simple of said premises, that they are free from all encumbrances unless otherwise noted above, that it has a good right to sell and convey the same as aforesaid, and that it will, and its successors and assigns shall, warrant and defend the same to the said P.M. Johnston, District Attorney of the 24th Judicial Circuit, as the Trustee for the City of Vernon, Alabama and Lamar County, Alabama, his successors, executors, and assigns forever, against the lawful claims of all persons."
This deed was filed with the probate court on August 8, 1990. Thereafter, on June 17, 1991, a deed was executed transferring the property to the appellant in consideration for $50,000. The deed contained language stating on behalf of the district attorney, as grantor, "that I am lawfully seized in fee simple of said premises; that they are free from all encumbrances; that I have good right to sell and convey the same as aforesaid; that I will and my successors and assigns shall warrant and defend the same to the said grantee, his successors and assigns forever, against the lawful claims of all persons." Thus, the State's evidence proves that the sale of the property was lawful and that the Mental Health Center became the lawful owner of the property, which it purchased from the appellant.
In Evans v. State, 508 So.2d 1205 (Ala.Cr.App. 1987), the defendant, a supervisor of a slaughterhouse at a prison, was convicted of theft by deception for having aided and abetted in the sale of inferior, ungraded beef to the prison. This court held that, although his conduct established deception by knowingly selling beef graded "Top No-Roll" instead of "Good," he was not shown to have deprived the State of the value of its contract because the evidence failed to establish that he had delivered a product that was not equivalent to the contract's specification. In Evans, this court concluded as follows:
 "[The appellant's codefendant] contracted with the State to provide U.S.D.A. 'Good' beef forequarters. His invoices to the State reflected that he *Page 106 
 was supplying that particular meat, yet he undisputedly did not provide, and he knew that he was not providing, what the contract specified and what his invoices reflected. Under the circumstances, [the codefendant] deceived the State within the meaning of § 13A-8-1(1)(a)-(d). Yet, deception unaccompanied by an intent to deprive the owner of its property, is not theft. Ala. Code 1975, § 13A-8-2(2). The prosecution presented no evidence of [the codefendant's] intent to deprive the State of the value of its contract, but in fact proved that he did not have that intent.
". . . .
". . . .
". . . .
 "The prosecution did present evidence that, after it came to the attention of State officials that [the meat packing company] had been supplying ungraded meat to the prison, [the codefendant] insisted that [the meat brokerage firm that actually purchased the meat] arrange to have graded meat on the next load. Six graded beef forequarters were on the rear of the next truckload of [this] supplied meat to Draper prison. The most that can be said of this evidence is that it highlights [the codefendant's] deception of the State, but it does not prove his intent to deprive the State of what he considered contract-equivalent quality meat. The prosecution fully proved [the codefendant's] deception from the fact of his misrepresenting the beef as graded when it was actually ungraded. The above evidence merely emphasizes [the codefendant's] deception regarding the ungraded nature of the beef but it does not prove [the codefendant's] intent to have supplied less than what he considered an equivalent quality beef.
 "Thus, for purposes of the criminal prosecution of [the codefendant], evidence that the meat received by the State of Alabama was of quality inferior to that called for by contract does not settle the issue of [the codefendant's] criminal intent. Even assuming that the State received poor quality meat, the prosecution was still required to prove [that the codefendant] knew the meat was poor in order to convict him of theft. When the prosecution's own undisputed evidence established that [the codefendant] ordered, paid for, and had no reason to believe that the State did not receive a product equivalent to contract specifications, [the codefendant] was not shown to have had the intent to deprive the State of the value of its contract."
508 So.2d at 1207-09. (Emphasis in original.)
In the present case, although the appellant clearly knew that he was deceiving both the city and state governments, as well as the Mental Health Center, he testified, and attempted to prove, that not only was his property the equivalent of the purchase price, but it was worth $28,000 more than the purchase price. Therefore, the State failed to present a prima facie case of theft by deception against the appellant and a judgment in the appellant's favor must be rendered. Thus, the other issues raised by the appellant in his brief addressing the conviction on Counts I and II of the indictment will not be addressed.
 II
The appellant argues that the evidence presented by the State was insufficient to prove that he violated the State Ethics Law, by violating § 36-25-5, Code of Alabama 1975. This statute provides:
 "(a) No public official or employee shall use an official position or office to obtain direct personal financial gain for himself, or his family, or any business with which he or a member of his family is associated unless such use and gain are specifically authorized by law."
The appellant specifically argues that the State failed to provide sufficient evidence to support his conviction, in that they failed to prove the element of "gain." The definition section of this act, codified at § 36-25-1, contains no definition for the term "gain" or "personal financial gain." However, it is clear from the policy behind this statute, that the term "gain" is not intended to be a precise or comparative term, *Page 107 
because it is the appearance of impropriety that this statute seeks to avoid.
 "A primary objective of the Code of Ethics is that governmental officials avoid recurring situations in which there is a temptation to place personal gain, economic or otherwise, above the discharge of their fiduciary duty to the public. There is nothing new or startling about this concept. The avoidance of the appearance of impropriety is an ethical norm which has governed the conduct of attorneys and judges for decades. Certainly, there is nothing to prevent the Legislature from extending the application of this norm to all branches of the government. Indeed, this is precisely what the Legislature intended. . . ."
Zerweck v. State Commission on Ethics, 409 So.2d 57, 60-61
(Fla.Dist.Ct.App. 1982). See also Leffingwell v. Lake City,257 Iowa 1022, 135 N.W.2d 536, 539 (1965).
 ". . . The mere fact that a governmental body may be interested in acquiring property in which a public official has a personal interest does not, by itself, invoke sanctions of such statutes. However, if the interest of the governmental body intensifies to the extent that serious negotiations and discussions regarding the property ensue and the public official has an opportunity to influence the negotiation in any way, the statute is violated. To claim that any violation of the law does not occur until a contract has been entered into would emaciate the statute and vitiate its legislative purpose. The law would no longer effectively deter a self-dealing official, in the capacity of his position, from engaging in negotiations with other parties for the purpose of purchasing property in which he also had a personal interest. This would permit that official to sell his interest at a time when making of the contract had advanced to a point where it assuredly would be executed."
63A Am.Jur.2d Public Officers and Employees § 411.
The appellant clearly realized personal financial gain, by receiving $50,000, some of which was used to pay off his liens or encumbrances on the property and Butler's commission. The remainder, less $2,000 he kept in cash, he deposited in the bank. Although the appellant argues that he did not receive "gain," meaning "profit," because, based on the sales of other adjoining property over the preceding five-year period, he could have sold the property for $28,000 more than he received, the State sufficiently proved gain. The appellant had owned the property since 1948 and, although how he acquired the property and what, if anything, he paid for it is not included in the record, he most likely received gain in terms of taxable income upon the sale of the property. The State also presented evidence that, approximately six days after he received the proceeds from the sale of the property, a judgment was entered against him by the Bank of Vernon for a substantial amount.[4]
 III
The appellant argues that the indictment charging him with six counts of violating the State Ethics Law are void, because the indictment used the words "unlawfully" and "feloniously" to allege mens rea rather than "knowingly." The appellant cites the punishment section of this act, § 36-25-27, Code of Alabama
1975, which uses the terms "knowingly" and "wilfully" to define the requisite mens rea necessary to commit the offense, and he argues that those terms were therefore required in framing the indictment. His argument is based on Davis v. State, 68 Ala. 58
(1880), which involved an indictment charging a violation of a statute defining as unlawful the transportation of cotton after dark. A subsequent section of that statute made it a crime to "knowingly" violate any other section of that statute. The Court held that this element of knowledge must be included and charged in the indictment. *Page 108 
 "Sometimes statutes make it a criminal offense for a public officer to be directly or indirectly concerned in any agreement or contract for any improvement to be made at the public expense, or any other contract made by the officer in his official capacity. Even in the absence of an express statement that criminal intent is a necessary element of the statutory offense, the statutes, in the absence of a clear indication to the contrary, are construed as requiring that the officer's concern in the contract be corrupt."
63A Am.Jur.2d Public Officers and Employees § 411.
Thus, it is clear that in the State Ethics Law such a mens rea is impliedly included and, in the present case, was proved. According to § 13A-2-4(b), Code of Alabama 1975:
 "Although no culpable mental state is expressly designated in a statute defining an offense, an appropriate culpable mental state may nevertheless be required for the commission of that offense, or with respect to some or all of the material elements thereof, if the proscribed conduct necessarily involves such culpable mental state. A statute defining a crime, unless clearly indicating a legislative intent to impose strict liability, states a crime of mental culpability."
Clearly, this offense is not one involving strict liability.
Moreover, the record indicates that this issue was waived, although the appellant is claiming that the indictment fails to sufficiently charge an offense. In Ex parte Harper,594 So.2d 1181 (Ala. 1991), the Alabama Supreme Court addressed an allegation that an indictment was void for failing to charge an offense, specifically that the indictment failed to charge that the defendant "knowingly" unlawfully sold or distributed a controlled substance. The Alabama Supreme Court cited Rule 16.2(d), A.R.Cr.P.Temp. (now Rule 15.2(d), A.R.Cr.P.), and held that a defendant is required to raise a claim that an indictment fails to state an offense " 'during the pendency of the proceeding.' " Id. at 1194. Because the appellant raises this claim for the first time on appeal, this objection is untimely.
 IV
The appellant argues that there is a variance between the allegations in the indictment, concerning the allegations of violations of the State Ethics Law, and the proof at trial. Specifically, the appellant argues that, because the evidence presented at trial did not prove that the money he received was the money paid by the city and county, there was a fatal variance between the indictment and the proof. He argues that neither the city nor the county purchased land from, or paid money to, him. He submits that the evidence showed that he did not sell land to the Mental Health Center, but rather to Banks Butler. Thus, his argument hinges on the fact that Banks Butler was used as his straw man.
The proof at trial established that Banks Butler was acting at the appellant's direction and that the appellant ultimately received the majority of the proceeds from the sale of the property. Furthermore, the property was deeded to Butler by the appellant for nominal consideration and the deed was backdated to give the transaction an air of legitimacy. Because the proof showed that the appellant did realize personal gain from the sale of the property, see Part II, and because it was the appellant's property that was the subject of negotiation by, and ultimately sold to, the Mental Health Center, there was no variance between the indictment and proof. Cf. the case law pertaining to an indictment's failure to charge an accused as a conspirator or aider and abettor, at 11B Ala. Digest,Indictment, Key, # 174.
 V
The appellant argues that a portion of the trial court's instruction to the jury was so confusing and prejudicial as to require reversal. The record indicates that the trial court instructed the jury as follows:
 "The first two of those counts charged that the Defendant committed theft of property in the first degree by deception. *Page 109 
 The counts three through eight charged that the Defendant used his office for personal gain in violation of the Code of Ethics that govern the conduct of public officials in the State of Alabama.
 "Further, it's been pointed out to you that though this indictment contains eight counts, it effectively charges one offense. And in a finding of guilt as to one count, anyone of the counts would be no greater than finding guilt as to all of the counts. Finding innocence of one or all of the counts likewise would have the same effect. There will be only one punishment imposed by the Court under this indictment is the point that I am trying to make."
The appellant argues that this charge was confusing, because the trial court subsequently instructed the jury concerning each count of the indictment. He also alleges that he was prejudiced thereby because this instruction would cause the jury to find him guilty of all counts, if it found him guilty at all, because the jury would believe that an acquittal as to one of the counts would lead to an acquittal as to all counts.
However, the record indicates that the appellant failed to preserve this matter for review, because he failed to object on this ground at trial. Following the trial court's oral charge to the jury, although the appellant objected to the trial court's failure to give a charge relating to intent or mens rea, he did not raise this ground. Therefore, this issue is waived. Harrington v. State, 515 So.2d 53 (Ala.Cr.App. 1986).
 VI
The appellant argues that the trial court erred by failing to instruct the jury as to the mens rea or intent element of a violation of the State Ethics Law, § 36-25-5, Code of Alabama
1975. Although the appellant clearly objected on this ground following the trial court's oral charge, the record contains no ruling on this objection, or any further discussion, until the entry of the verdict. Thus, "this issue was not properly preserved for our review since the trial court never ruled on the request. ' "The law in Alabama is well settled that a preliminary requirement in preserving appellate review consists of an objection and an adverse ruling." Pinkard v. State,405 So.2d 411, 416-17 (Ala.Cr.App. 1981) (emphasis added [inGarnett]).' " McLeod v. State, 581 So.2d 1144, 1158
(Ala.Cr.App. 1990) (wherein trial court failed to give adverse ruling on the record to the appellant's request that the jury be given an alibi charge) (quoting Garnett v. State,555 So.2d 1153, 1156 (Ala.Cr.App. 1989)).
 VII
The appellant argues that the trial court erred in refusing to give his requested jury instructions regarding the defense of good faith. However, the record includes no adverse ruling by the trial court concerning its refusal to give these requested charges. Therefore, this matter is waived.Garnett v. State, 555 So.2d 1153 (Ala.Cr.App. 1989); McLeod v.State, supra.
 VIII
The appellant argues that the trial court erred in denying his motion to exclude or, alternatively, his motion for mistrial, based on the prosecutor's argument during closing concerning the appellant's possibility of probation. The prosecutor's comments in question are as follows:
 "The sentence is imposed by the Judge if he's convicted. Within his authority, the Judge can do several things. He can set a punishment within the range of the statute in the penitentiary. He can grant Mayor Chandler probation. That would be done, if it is done, the sentencing and probation granted, at a hearing to determine whether or not Mr. Chandler's reputation, his past record, warrants him being placed on probation. There is also consideration given at that hearing as to the health of the Defendant if he's convicted.
 "Judge Junkin has the authority to consider all of that and my recommendation, whatever it may be. At this point I'm not sure that I would recommend any penitentiary time to be served for the Mayor. I really don't think I would." *Page 110 
The appellant's specific argument is that these comments called to the jury's attention the possibility that the appellant might be placed on probation. The State argues, citing many examples, that these comments by the prosecutor were made in reply to a number of appeals by defense counsel during his closing for sympathy and defense counsel's comment that the jury not "retire the most distinguished political figure that your county has produced to the penitentiary."
 "The prosecutor has a right to comment on and answer statements made by defense counsel in argument to the jury. Dollar v. State, 26 Ala. App. 361, 159 So. 704 (1935); Moragne v. State, 16 Ala. App. 26, 28, 74 So. 862, 864, reversed on other grounds, 200 Ala. 689, 77 So. 322 (1917). Counsel should be afforded wide latitude in responding to assertions made by opposing counsel in previous argument. York v. State, 34 Ala. App. 188, 190, 39 So.2d 694, 696 (1948), cert. denied, 252 Ala. 158, 39 So.2d 697 (1949). 'Wide latitude is given the solicitor in making reply to argument previously made by appellant's counsel.' Moody v. State, 40 Ala. App. 373, 374, 113 So.2d 787, 788 (1959). 'Wide latitude is given a district attorney in making reply in kind, . . . and the propriety of argument of counsel is largely within the trial court's discretion.' Jetton v. State, 435 So.2d 167, 171
(Ala.Cr.App. 1983)."
Dossey v. State, 489 So.2d 662, 665 (Ala.Cr.App. 1986). "The trial judge can best determine when discussion by counsel is legitimate and when it degenerates into abuse." Anderson v.State, 469 So.2d 1362, 1364 (Ala.Cr.App. 1985), and cases cited therein.
In the present case, after a review of the entire closing arguments, it is clear that the prosecutor's comments were made in response to the defense counsel's argument and, therefore, we find no abuse of discretion by the trial court.
 IX
The appellant argues that the trial court erred to reversal by excluding evidence, which the appellant sought to admit, concerning the value of his property. The appellant argues that this evidence was relevant and necessary to refute the State's allegations that the appellant received a gain from the sale. However, during the cross-examination of the appellant, he was allowed to testify that he lost $28,000 on the sale and that he based his evaluation on the sale of other property adjacent to his property. Therefore, any error in excluding the evidence was harmless, because it was admitted during the appellant's cross-examination. Latimore v. State, 534 So.2d 665
(Ala.Cr.App. 1988). Moreover, in light of this court's holding in Part II, i.e., that the evidence clearly established that the appellant realized gain, any error was harmless. Rule 45, A.R.App.P.
 X
The appellant argues that the cumulative effect of all the errors resulting from the conduct of the prosecutor and/or the trial judge was to deny him a fair trial.
 "Because we find no error in the specific instances alleged by the appellant, we find no cumulative error. 'Where no single instance of alleged improper conduct constituted reversible error, we do not consider their cumulative effect to be any greater. Sprinkle v. State, 368 So.2d 554, writ. quashed, Ala., 368 So.2d 565 (1978).' Thomas v. State, 393 So.2d 504, 509
(Ala.Cr.App. 1981)."
Fisher v. State, 587 So.2d 1027, 1039 (Ala.Cr.App.), (cert. denied, 587 So.2d 1039 (Ala. 1991), cert. denied, ___ U.S. ___,112 S.Ct. 1486, 117 L.Ed.2d 628 (1992).
 XI
Because the appellant's sentence was imposed as to all counts of the indictment and because we are reversing and rendering a judgment in the appellant's favor on two counts of the indictment, we are remanding the case to the trial court for resentencing on the six counts of the indictment judgment as to which we are affirming the trial court's judgment. A return is to be filed with this court within 45 days.
AFFIRMED AS TO CONVICTION ON COUNTS III, IV, V, VI, VII AND VIII; *Page 111 
REVERSED AND JUDGMENT RENDERED FOR APPELLANT AS TO CONVICTION ON COUNTS I AND II; AND REMANDED FOR RESENTENCING.
PATTERSON, P.J., and TAYLOR, J., concur.
BOWEN, J., concurs in the result only, without opinion.
MONTIEL, J., concurs in part and dissents in part, with opinion.
[1] However, the appellant testified that the minutes would indicate that he had voted for the appropriation even if he had abstained from voting.
[2] The appellant stated that apparently, because of certain problems with the property ultimately purchased, the federal funding was denied.
[3] The trial court instructed the jury as to these statutory methods of deception.
[4] There is a conflict in the record as to whether this amount was $47,000 or $67,000. It is clear, however, that, had the appellant owned this property when the judgment was entered, the property would have been attached to secure all, or part of, that judgment.