Harold Guy Hunt, Governor of the State of Alabama, was indicted by a grand jury and convicted by a petit jury of violating the Alabama Code of Ethics for Public Officials, specifically § 36-25-5, Ala. Code 1975, which provides:
 "No public official or employee shall use an official position or office to obtain direct personal financial gain for himself, or his family, or any business with which he or a member of his family is associated unless such use and gain are specifically authorized by law."
His sentence of five years' imprisonment was suspended upon the condition that he perform 1,000 hours of community service. Hunt appealed to the Court of Criminal Appeals, which affirmed his conviction and sentence. We granted certiorari review. The procedural history of this case is set out in the opinion of the Court of Criminal Appeals. Hunt v. State, 642 So.2d 999
(Ala.Cr.App. 1993).
Hunt does not deny that he used the money that is the basis of this prosecution for his direct personal gain. In fact, the evidence that he did so is not contradicted. The Alabama Ethics Commission found probable cause to believe that Hunt had violated the Ethics Act and, in accordance with the Act, sent its findings to the attorney general. Hunt petitioned the United States District Court for the Middle District of Alabama to enjoin any prosecution against him on the ground that the Ethics Act did not apply to the Governor. The District Court refused to do so. Hunt v. Anderson, 794 F. Supp. 1557
(M.D.Ala. 1992). Hunt appealed that decision to the United States Court of Appeals for the Eleventh Circuit. That court also rejected Hunt's argument that the state ethics law does not apply to the state's highest elected official. Hunt v.Anderson, 976 F.2d 744 (11th Cir. 1992).
Hunt was indicted by the grand jury on December 28, 1992.
The record reveals the following pertinent facts: Hunt was elected Governor of the State of Alabama on November 4, 1986. After the election, an inaugural committee was *Page 1062 
formed to raise money to finance Hunt's inauguration. The money was to be raised from the sale of tickets to the various inaugural events and from the sale of advertising in a souvenir program for the inauguration.
On November 26, 1986, an account was opened at the Union Bank and Trust Company in Montgomery, styled "1987 Alabama Inaugural Committee." In December 1986, the name on the 1987 Alabama Inaugural Committee account was changed to "Hunt Transition and Inaugural Fund, Inc." ("HT IF, Inc."). James W. Wilson, Jr., chairman of the inaugural committee, sent a letter, dated December 19, 1986, to potential finance committee members detailing the plan to raise money through the sale of inaugural event tickets and the sale of advertising in a souvenir program. Wilson's letter contained the following statement with regard to the fundraising effort:
 "All of the expenses of the inaugural preparations, the costs of the transition to the new administration, and the costs of the inaugural events themselves must be paid for by the Hunt Transition and Inaugural Fund, Inc. The proceeds from the sale of inaugural tickets, advertising, and other contributions go into that account and will be used to pay for all these activities. No taxpayer funds are used."
Enclosed with Wilson's letter was a form response letter addressed to Wilson; on that form letter potential finance committee members could indicate in what manner they were willing to participate in the inaugural events and the fundraising effort. This letter contained instructions for writing checks for tickets or advertising. The letter instructed that corporate checks for advertising should be made out to HT IF, Inc., and that personal checks for tickets should be made out to 1987 Alabama Inaugural Committee, the former name on the HT IF, Inc., account.
On December 31, 1986, HT IF, Inc., was incorporated as an Alabama nonprofit corporation. The articles of incorporation describe its purposes:
 "to provide a non-profit organization to receive and administer funds provided by contributions, subscriptions and other sources to:
 "(a) effect an orderly and efficient transfer of the Office of Governor of Alabama to Honorable Guy Hunt, Governor-elect;
 "(b) defray a part of the costs of the inauguration of Governor Hunt;
 "(c) renovate and improve the building provided by the State as a residence for the Governor and his family and known as the Governor's Mansion.
 "(d) assist the Governor and his staff to promote the general interest and welfare of the State of Alabama and its people in various other ways including, without being so limited, through attracting additional business and industry to the state, advertising the state and its resources and supporting other organizations with similar or like purposes.
 "(e) promote or carry out other scientific, educational, civic, patriotic, political, historical, literary, religious or charitable purposes as may be permitted by law and are not inconsistent with the provisions of these Articles of Incorporation,
 "all to the extent such purposes are not paid for by public funds; provided, however, that no part of the funds, principal, income, property, assets or resources of the corporation shall be used, committed, expended or paid, directly or indirectly, to aid, promote, defeat or prevent the nomination or election of any person or any question or proposition submitted to the vote of the people or the interest of any political party."
HT IF, Inc., was organized as a charitable organization, not as a political organization. The articles of incorporation specifically forbid the use of any funds raised by HT IF, Inc., for political purposes. In spite of the express provision to the contrary, Judith Pittman, the executive director of the inaugural committee, an employee of HT IF, Inc., testified that one of the inaugural committee's goals from the beginning was to raise money for political purposes, despite legal advice to the effect that funds raised for the transition and inaugural activities should not later be used for political purposes. The inaugural committee included, on some of its *Page 1063 
correspondence to finance committee members and ticket purchasers, a notation indicating that in the event net revenues were generated from the ticket sales to individuals or political action committees, these revenues might be used for political purposes.
Pittman testified that the inaugural committee planned to segregate the funds raised from ticket sales and those raised from advertising sales. The inaugural committee instructed the purchasers of advertising to make checks payable to HT IF, Inc., and it earmarked these funds for transition and inaugural purposes. These funds were to be deposited in the HT IF, Inc., account at Union Bank and Trust. Individuals and political action committees were instructed to make checks for tickets payable to 1987 Alabama Inaugural Committee. These funds were earmarked for campaign purposes and were to be deposited in a Friends of Guy Hunt Account at Union Bank and Trust.
An examination of the checks deposited into the HT IF, Inc., account and the Friends account at Union Bank and Trust revealed that both accounts received proceeds from checks made out to 1987 Alabama Inaugural Committee and checks made out to HT IF, Inc., and that both received proceeds from checks bearing notations indicating that they were issued to pay for tickets and from checks bearing notations indicating that they were issued to pay for advertising. Between January 8, 1987, and February 12, 1987, $394,573 raised from inaugural event tickets and advertising sales was diverted from HT IF, Inc., and deposited into the Friends account at Union Bank and Trust. On February 12, 1987, three $100,000 checks were written on that account.
Check number 101 from the Friends account, for $100,000, was made out to Friends of Guy Hunt and was deposited in a savings account bearing that name in Cullman Savings and Loan Association (that account shall be referred to as the "Cullman Friends" account). Hunt was an authorized signatory on this account. The bulk of the funds in this account were withdrawn in the form of cashier's checks, payable to Guy Hunt, and were deposited in his personal account. On November 12, 1988, a single or consolidated signature card was created for this Cullman Friends account and for another account at Cullman Savings and Loan called "Guy Hunt or Mrs. Guy Hunt." It was signed only by Hunt, who was, therefore, at that time, the sole signatory on both accounts. On December 29, 1989, the last withdrawal from this Cullman Friends account was made in the form of a cashier's check payable to Guy Hunt or Mrs. Guy Hunt in the amount of $11,700. Hunt deposited this check in his personal account. These funds were used to cover a $16,297 check drawn on the personal account to make a payment on a note secured by a mortgage on Hunt's farm.
Check number 102 from the Friends account, for $100,000, was deposited in a new Friends account at AmSouth Bank. Hunt was an authorized signatory on this account. The $100,000 was left in this account until June 18, 1987, where it earned approximately $2,000 in interest. On June 18, 1987, the $100,000 was transferred to HT IF, Inc. The $2,000 in interest was transferred, by various checks made out to Hunt, to his personal accounts.
Check number 103 from the Friends account, for $100,000, was deposited into an account at First Federal Savings and Loan in Cullman, called "Friends of Guy Hunt, Guy Hunt Reserve." Hunt was an authorized signatory on this account. The checks written on this account were issued to pay various personal expenses.
The State established without contradiction that Hunt used his office to raise several million dollars from late 1986 to early 1987. It also established that several hundred thousand dollars of this money was used for the direct personal gain of Hunt or members of his family. Hunt argues that even so, his conviction should be reversed. Specifically, he argues (a) that the funds were campaign funds and that the Fair Campaign Practices Act, Ala. Code 1975, § 17-22A-1 et seq., provides that campaign funds may be used for any lawful purpose; (b) that other elected officials have converted campaign funds for personal use and have not been prosecuted, and thus the state should be estopped to prosecute him; (c) that the *Page 1064 
conversion of these funds for personal use took place more than three years before the indictment was returned and, thus, that his prosecution is barred by the applicable statute of limitations.
Hunt contends that the trial court committed numerous errors and that any one of these errors is sufficient to require reversal of his conviction.
 I
Hunt first argues that his indictment should have been dismissed because, he says, his prosecution was discriminatory. The analysis of this argument will apply equally to his argument that his prosecution should have been barred by principles of equitable estoppel or that his prosecution amounts to an ex post facto application of the law. The essence of Hunt's arguments on these issues is that the funds he used for his direct personal financial gain were campaign funds. Hunt argues that his prosecution was selective because numerous other public officials had used excess campaign funds for direct personal financial gain and were not prosecuted. Hunt argues that his prosecution should have been barred by principles of equitable estoppel and that his prosecution amounts to an ex post facto application of the law because, he says, for years the Ethics Commission and the attorney general had told people that spending campaign funds for personal use was not illegal so long as the one using the funds treated them as income and paid taxes on that income. This argument might have some force if the funds involved were, in fact, campaign funds. However, the facts show that the funds used by Hunt were not campaign funds, but that they were, instead, funds solicited by and contributed to a nonprofit charitable corporation.
HT IF, Inc., was organized to raise money by selling tickets to events staged to celebrate Hunt's inauguration as Governor of Alabama. Its employees sold tickets to the events and sold advertising in a souvenir program. Pursuant to the purposes enumerated in the charter of that charitable organization, the funds were to be used to effect an orderly transition of government, to cover the costs of the inauguration, to renovate the Governor's mansion, to attract business to the State, and to carry out other charitable purposes.
Instead of being used for the purposes stated in the charter of HT IF, Inc., some of the money raised by HT IF, Inc., was diverted and deposited, not into the HT IF, Inc., account, but into the Friends account at Union Bank and Trust. In support of Hunt's argument that the funds used for personal gain were campaign funds, Judith Pittman testified that, all along, the inaugural committee, of which she, an employee of HT IF, Inc., was a member, intended to raise political funds. Pittman testified that letters sent out by her committee stated that "profits" would be used for political purposes. This is directly contradicted by the articles of incorporation of HT 
IF, Inc., and was contrary to a legal opinion directed to the officers and employees of the nonprofit corporation warning them that funds raised by that corporation could not legally be used for political purposes or converted to political funds. Even if one assumes the accuracy of Pittman's testimony that "profits" were to be used for political purposes, the facts establish that the inaugural funds raised by the nonprofit corporation were diverted before it could have been determined whether HT IF, Inc., would make a profit. For example, a check made out to the "Hunt Transition and Inaugural Fund" for inaugural fund program advertising was deposited into the political Friends account on December 31, 1986, even before the inaugural events took place.
Hunt was indicted for using his office for his direct personal financial gain. Hunt does not deny the fact that the office of Governor of the state, to which he had just been elected, was used to raise the funds, nor does he deny that the funds were raised by a nonprofit, nonpolitical corporation to defray the cost of the inaugural events. Hunt likewise does not deny that part of these funds were used for his direct, personal financial gain. He merely asserts, despite the evidence to the contrary, that the funds were campaign funds. His effort to characterize the funds as campaign funds fails when weighed against the uncontested facts. Hunt was not *Page 1065 
indicted for using campaign funds for personal gain. His assertions that other public officials have used campaign funds for personal gain and have not been prosecuted, making his prosecution discriminatory, is without merit.
The Ethics Commission and the attorney general had stated in the past to elected officials that excess campaign funds could be used for any lawful purposes, as provided in the Fair Campaign Practices Act. However, that has no bearing on Hunt's contention that he has been subjected to discriminatory prosecution. He is being prosecuted for using the Governor's office for direct personal financial gain in violation of the Ethics Act. Even though the Fair Campaign Practices Act permits the use of excess campaign funds for any lawful purpose, the use of an elected office to raise money for direct personal financial gain, made unlawful by the Ethics Act, does not constitute a lawful purpose under the Fair Campaign Practices Act.
 II
Hunt next argues that the trial court's instruction to the jury on the use of excess campaign funds amounted to a directed verdict for the State and was reversible error. The portion of the charge that Hunt says was erroneous consists of but one sentence of an 11-page jury charge. The jury charge as a whole is set out in the opinion of the Court of Criminal Appeals.Hunt v. State, 642 So.2d 999 (Ala.Cr.App. 1993). Hunt objects to the last sentence of the following paragraph:
 "There is the law called the Fair Campaign Practices Act. That law provides that a committee, a political committee, shall maintain a checking account and shall deposit any contributions received by such committee into such account. No expenditure of funds may be made by any such committee except by check drawn on such account or out of a petty cash fund from which it may make expenditures, not in excess of one hundred dollars to any person in connection with a single purchase or transaction. The Fair Campaign Practices Act became effective July the 1st, 1988. This Act says the following in regard to the use of excess campaign contributions. Amounts received by a principal campaign committee as contributions that are in excess of any amount necessary to defray expenses of the candidate represented by such committee, may be used by such candidate to defray any ordinary and necessary expenses incurred by him or her in connection with his or her duties as holder of office, may be contributed by him or her to any organization described in the title, may be transferred to another political committee, or may be used for any other lawful purpose. The Court would charge the jury that it is not unlawful to use excess campaign funds to defray any ordinary and necessary expenses incurred by the Defendant in connection with any duties as a holder of office. I would further charge this jury that it is not unlawful to use excess campaign funds to reimburse old or new campaign debts, or the interest on the said debts where the debts were incurred for and are connected to campaign expenses. The Court would further charge the jury that the Alabama Ethics Act provides that no public official shall use an official position or office to obtain direct personal financial gain for himself, or his family, or any business with which he or a member of his family is associated, unless such use and gain are specifically authorized by law. The use of excess campaign funds for direct personal financial gain is, therefore, not a 'lawful purpose' as that phrase is used in the Fair Campaign Practices Act."
Hunt v. State, 642 So.2d at 1009.
As indicated, Hunt insisted throughout the trial that the money raised by the nonprofit corporation after his election and diverted to his political accounts and then into his personal account and spent for personal use was campaign money. The trial court charged the jury that if it believed that the Governor, after his election, used his office to raise money for his direct financial gain (even if such money was campaign funds), that would not be a "lawful purpose" as that phrase is used in the Fair Campaign Practices Act. Because Hunt insisted throughout the trial that the money he used was campaign funds, *Page 1066 
it was not error for the trial court to address that issue in the context of the charge. The court's charge in its entirety correctly states the law applicable in this case, and it could not have misled the jury. It did not, as Hunt contends, amount to a directed verdict against him. Even though the Fair Campaign Practices Act permits the use of excess campaign funds for any lawful purpose, the use of an elected office to raise money for direct personal financial gain, made unlawful by the Ethics Act, does not constitute a lawful purpose under the Fair Campaign Practices Act. Thus, the charge was not error. If it had been error to refer to the Fair Campaign Practices Act — and we hold that it was not, because Hunt insisted that the money he converted to his own use was campaign funds — the error would have been harmless.
Rule 45, A.R.App.P., provides for a harmless error analysis of an alleged misdirection of a jury.
 " '[T]he fact that isolated instructions are erroneous or misleading is no ground for reversal where the instruction as a whole presents the case properly. . . . Where a portion of the oral charge is erroneous or misleading, the whole charge may be looked to, and the entire charge must be construed together to see if there be reversible error.' "
Ex parte Nelson, 595 So.2d 510, 512 (Ala. 1991), quoting Harrisv. State, 412 So.2d 1278, 1281 (Ala.Cr.App. 1982); see alsoGrayco Resources, Inc. v. Poole, 500 So.2d 1030, 1033
(Ala. 1986). We hold that the jury charge, viewed in its entirety, does not require reversal.
Hunt further argues that, if the trial court thought that the case did not involve campaign funds, then the court should not have admitted evidence on that issue, and, because it did admit evidence on that issue, Hunt says the charge he complains of was devastating. Again, we point out that Hunt defended the charge in part on his contention that the funds were campaign funds. He offered the evidence that he now says should not have been admitted. The jury heard that evidence. The charge merely addressed the issues raised in the trial. We conclude, as did the Court of Criminal Appeals, that Hunt should not be allowed to insert the issue of campaign funds into the trial and then complain that the trial judge instructed the jury on the law as it relates to that issue. Hunt v. State, supra.
 III
Hunt presents two arguments relating to the statute of limitations applicable to a violation of the Ethics Act.
 A
Hunt's first statute of limitations argument is that his prosecution was barred by the three-year statutory period of limitations applicable to prosecutions under the Ethics Act. The trial judge dismissed 12 of the 13 counts of the indictment against Hunt. Counts II through XIII charged Hunt with crimes of theft, receiving stolen property, and conspiracy. Count I charged Hunt with using his public office for a direct personal financial gain, a violation of the Ethics Act. Hunt contends that the trial court erred in not also dismissing Count I.
A violation of the Ethics Act is a felony to which the three-year statutory period of limitations applicable to felonies in general applies. Ala. Code 1975, § 36-25-27(a); §15-3-1; Britain v. State, 518 So.2d 198, 201 (Ala.Cr.App. 1987). A limitations period runs from the time a crime is committed, which is determined as the time when all of its essential elements are present and complete. Pendergast v. United States,317 U.S. 412, 63 S.Ct. 268, 87 L.Ed. 368 (1943); Griffin v.State, 352 So.2d 847, 850 (Ala. 1977).
Hunt was indicted under Ala. Code 1975, § 36-25-5(a), which prohibits only those uses of an official position that result in financial gain that is "direct" and "personal." §36-25-5(a); Lambert v. Wilcox County Comm'n, 623 So.2d 727, 730
(Ala. 1993). Therefore, until Hunt had a direct personal financial gain as a result of the use of his public office, the statutory offense was not complete. Hunt does not dispute the fact that he had a direct personal financial gain. He does, however, dispute the date on which that gain occurred. *Page 1067 
Hunt argues that the last possible date that he obtained any gain was November 12, 1988; he says that on that date the Cullman Friends account, into which check number 101 from the Friends account at Union Bank and Trust was deposited, was closed and merged into his personal account. He argues that the Ethics Act's definition of "personal financial gain" is not intended to be a precise or comparative term, and that, according to Chandler v. State, 615 So.2d 100
(Ala.Cr.App. 1992), the intent of the Ethics Act is to avoid the appearance of impropriety. Hunt further argues that Chandler
stands for the proposition that it is the receiving, rather than the spending, that completes the "direct personal financial gain."
We disagree. Chandler does stand for the proposition that the Ethics Act intended to avoid the appearance on impropriety.Chandler v. State, 615 So.2d at 107. However, the Act does not make the appearance of impropriety a crime. The offense proscribed by the Ethics Act is using a public office for direct personal financial gain. The crime was not complete when Hunt became the sole signatory on the account containing funds raised for his inauguration. The offense for which he was convicted was not committed until the inaugural funds were spent for an improper purpose and Hunt thereby obtained a direct personal financial gain. In effect, Hunt argues thatChandler's interpretation of the language "direct personal financial gain" as prohibiting the appearance of impropriety, is a broad definition. He argues that the broader term "receipt," rather than the more specific term "spend," was intended to describe the act that completes the commission of the crime defined in § 36-25-5. We reject this argument.
Our decision in Lambert v. Wilcox County Comm'n,623 So.2d 727 (Ala. 1993), should dispel any doubt about our interpretation of the "direct personal financial gain" language of § 36-25-5. In Lambert, 623 So.2d at 730, we addressed the history of § 36-25-5 and the legislature's intent in reenacting the Ethics Act. We concluded that by adding the words "direct" and "personal" to qualify the term "financial gain" in §36-25-5, the legislature intended to more narrowly define the class of private interests giving rise to an appearance of impropriety. Lambert, 623 So.2d at 730. In keeping with the intent of the legislature in reenacting the Ethics Act in 1975, we conclude that, upon Hunt's gaining exclusive control over the Cullman Friends account, the crime defined in terms of the receipt of a "direct personal financial gain" was incomplete. Although Hunt was in control of the funds at that time, he had not received an improper "direct personal financial gain." Only when Hunt, on December 29, 1989, transferred, by check, the $11,700 from the former Cullman Friends account to his personal account to cover a $16,297 payment on a note secured by a mortgage on his farm, did he receive a direct personal financial gain within the meaning of § 36-25-5.
 B
Hunt's second statute of limitations argument is that whether the limitations period had run was a question of fact that should have been submitted to the jury. He requested that the following instruction be given to the jury:
 "I charge you that the indictment in this cause was returned on December 28, 1992. I further charge you that the statute of limitations in this case is three (3) years and, therefore, any offense charged in the indictment is barred by the statute of limitations if the alleged offense occurred prior to December 28, 1989.
 "I charge you, therefore, that if you find from the evidence that the offense alleged in the indictment occurred prior to December 28, 1989, you must acquit the Defendant."
The trial judge refused to charge the jury on the statute of limitations issue because he held that whether the statutory period had run was a question of law. We agree. Alabama law allows the court to decide whether the limitations period has run if the facts regarding the commission of the alleged crime are not in dispute. Ramp Operations, Inc. v. Reliance Ins. Co.,805 F.2d 1552, 1558 (11th Cir. 1986) (applying Alabama law);Sexton v. Liberty Nat'l Life Ins. Co., 405 So.2d 18, 21
(Ala. 1981); see also Baron Tube Co. v. Transport Ins. Co.,365 F.2d 858, 860-61 (5th *Page 1068 
Cir. 1966) (applying Texas law). The analysis of this issue inBaron Tube, 365 F.2d at 861, is directly applicable to the facts of this case. There, the Court of Appeals for the Fifth Circuit stated:
 "The dates involved were undisputed. The only question concerned the impact of these facts under Texas law. This was a question of law, and the court was correct in not submitting the issue to the jury."
Baron Tube, 365 F.2d at 861.
Here, too, the dates involved are undisputed. It is undisputed that as of November 12, 1988, Hunt was the sole authorized signatory on the Cullman Friends account, the account into which the funds from check number 101 from the Friends account at Union Bank and Trust was deposited. It is also undisputed that on December 29, 1989, Hunt transferred $11,700 from that account into his personal account to cover a payment on a note secured by a mortgage on his farm. The only questions in this case concern the impact of these facts under Alabama law. Thus, the trial court correctly determined that whether the statute of limitations barred the prosecution was a question of law. Ramp Operations, 805 F.2d at 1558; Sexton, 405 So.2d at 21; Baron Tube, 365 F.2d at 861.
 IV
Hunt argues that the trial judge erred by not recusing himself, pursuant to Canons 3A(4) and 3C(1)(a), Alabama Canons of Judicial Ethics, after he had ex parte communications with James Anderson and David Shropshire. Thus, he also argues that the Court of Criminal Appeals erred by not reversing on that basis. Canon 3A(4) provides in relevant part:
 "(4) A judge should . . ., except as authorized by law, neither initiate nor consider ex parte communications concerning a pending or impending proceeding. A judge, however, may obtain the advice of a disinterested and impartial expert on the law applicable to a proceeding before him; provided however, a judge should use discretion in such cases and, if the judge considers that justice would require it, should give notice to the parties of the person consulted and the substance of the advice, and afford the parties reasonable opportunity to respond."
Canon 3C(1) provides in relevant part:
 "(1) A judge should disqualify himself in a proceeding in which his disqualification is required by law or his impartiality might reasonably be questioned. . . ."
At some time after the indictment was returned, but before the court orally charged the jury, Judge Thomas contacted James Anderson, who was, among other things, the chairman of the Alabama Ethics Commission for the period October 1991 through October 1992. Judge Thomas contacted Anderson and asked him "where in the law it says you can or can't use campaign funds for your personal use." Judge Thomas contacted David Shropshire, who was a member of his weekly prayer group and who was his prayer partner, to discuss the manner in which he should settle a dispute involving seating in the courtroom.
Judge Thomas did not notify the parties of these ex parte contacts. Canon 3A(4) generally prohibits ex parte contacts, but provides an exception for impartial experts on questions of applicable law. The Court of Criminal Appeals found that Judge Thomas's actions presented an appearance of impropriety.Hunt v. State, 642 So.2d at 64. Hunt argues that this impropriety raises questions about Judge Thomas's impartiality. He argues that the judge's impartiality might reasonably have been questioned and that he therefore should have recused himself pursuant to Canon 3C(1).
We have held:
 "The burden is on the party seeking recusal to present evidence establishing the existence of bias or prejudice. . . . Prejudice on the part of a judge is not presumed. . . . ' "[T]he law will not suppose a possibility of bias or favor in a judge who is already sworn to administer impartial justice and whose authority greatly depends on that presumption and idea." ' . . . Any disqualifying prejudice or bias as to a party must be of a personal nature and must stem from an extrajudicial source." *Page 1069 
Ex parte Melof, 553 So.2d 554, 557 (Ala. 1989) (citations omitted). Hunt argues that Judge Thomas's contacts with Anderson and Shropshire violated the Canons of Judicial Ethics and that, therefore, his conviction should be reversed and the indictment dismissed. However, Hunt offered no evidence that would show that Judge Thomas was prejudiced or biased. The communications between Judge Thomas and Anderson were favorable to Hunt, and the communication with Shropshire regarding how to settle a seating dispute in no way prejudiced Hunt. Therefore, Hunt failed to meet his burden with respect to recusal.
 V
Hunt argues that the trial court erred in denying his motions for a dismissal, for an acquittal, and for a new trial. Specifically, he argues that the court should have granted these motions on the basis that the court had denied Hunt's right to counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. Hunt argues that the denial of his right to counsel occurred when one of his defense attorneys, John E. Grenier, was called before the Montgomery County Grand Jury and was required to produce certain of Hunt's confidential files. The Court of Criminal Appeals rejected these arguments.
Hunt argues that there is little dispute that Grenier acted as one of Hunt's defense counsel. In a pre-trial proceeding, Hunt submitted an affidavit of attorney-client relationship and offered the testimony of M. Roland Nachman, Jr., to establish an attorney-client relationship between Hunt and Grenier. Nachman testified that his law firm, Balch Bingham, had been retained by Hunt, through Grenier, to represent Hunt in matters before the State Ethics Commission. Nachman testified that he "viewed" Grenier as one of the lawyers for Hunt's defense team. Nachman further testified that, although he could remember no specific conversation, Grenier had made it clear to him that Grenier was to be consulted regularly and that he represented Hunt. Nachman testified that, based on Grenier's participation in discussions regarding the matters before the Ethics Commission, he "assumed" that Grenier was acting as a member of Hunt's legal team.
Grenier, however, testified that he had never acted as an attorney with regard to any of Hunt's personal matters. Grenier testified that he asserted the attorney-client privilege before the grand jury out of an abundance of caution, but that, in regard to this case, he had acted solely in his capacity as Hunt's political adviser and in his capacity as chairman of the Hunt Transition and Inaugural Fund, Inc. Grenier testified that he had represented Hunt as an attorney in other cases, but that he had "never worn the lawyer hat with Hunt with respect to his political affairs." Grenier testified that he thought it was clear to Hunt that, because he was recommending the hiring of other attorneys, he was not acting as Hunt's attorney. Grenier further testified that he and his secretary had reviewed the files subpoenaed by the grand jury to ensure that they did not contain any material subject to an attorney-client privilege.
Hunt does not argue that the trial court erred in allowing Grenier to testify in violation of his attorney-client privilege. Rather, Hunt argues that allowing Grenier to testify and produce his files for the grand jury was an invasion of attorney-client confidences and violated the Sixth Amendment to the United States Constitution, citing Graddick v. State,408 So.2d 533 (Ala.Cr.App. 1981), writ quashed, 408 So.2d 548
(Ala. 1982). Hunt argues that the facts of this case, as developed at the evidentiary hearing, are virtually indistinguishable from those in Graddick. The cases are in no way similar.
In Graddick, the Court of Criminal Appeals held that an impermissible invasion of the attorney-client relationship occurred when an investigator working for the State of Alabama, wearing a microphone for the purpose of transmitting a conversation for recording, attended a meeting between the defendant and his attorney where the investigator knew that discussions regarding the defendant's defense strategy would take place. In Graddick, 408 So.2d at 544, the Court of Criminal Appeals used the analysis employed in United States v.Cooper, 397 F. Supp. 277 *Page 1070 
(D.Neb. 1975), to determine whether there had been a violation of the defendant's Sixth Amendment right to counsel. TheCooper analysis is as follows:
 " 'If a government informant (1) gains information (2) relating to a charge then pending or being investigated (3) from overhearing conversations by counsel expected to be confidential, and (4) the information is divulged before or during trial on that charge to the counsel handling the prosecution of that charge, then there has been a violation of the defendant's Sixth Amendment right to counsel. . . .' "
Graddick, 408 So.2d at 544 (quoting Cooper,397 F. Supp. at 285). We note that the obvious distinctions between this case and Graddick are that in this case there was no informant, there was no eavesdropping, and, as the trial court determined, there was no attorney-client communication relating to the prosecution.
Whether a communication is privileged is a matter solely within the discretion of the trial court, and our review on that issue is limited to determining whether the record supports that court's ruling. Richards v. Lennox Industries,Inc., 574 So.2d 736, 739-40 (Ala. 1990). Whether Grenier was acting in his capacity as a lawyer or was acting as a political adviser with respect to this case is in dispute. The record, however, contains evidence supporting the trial court's determination that, although Grenier had acted as Hunt's lawyer in some matters, Grenier was acting as the chairman of HT IF, Inc., and not as Hunt's attorney, in regard to the matters discussed before the grand jury. Therefore, the court could have found that no attorney-client confidences were involved in Grenier's testimony before that body. The record also contains evidence supporting the trial court's finding that if there was any invasion of attorney-client confidences relating to defense strategy, that invasion regarded matters other than Grenier's appearance before the grand jury.
In any event, Grenier testified that, in the proceeding before the grand jury, he declined to discuss matters concerning the ethics violations, and that he inspected the subpoenaed documents to ensure that they contained nothing covered by an attorney-client privilege. Therefore, we hold that the trial court correctly determined that there was no violation of Hunt's attorney-client privilege and no violation of Hunt's Sixth Amendment right to counsel.
 VI
The other issues raised by Hunt were properly addressed by the Court of Criminal Appeals. The judgment of that court is affirmed.
AFFIRMED.
HORNSBY, C.J., and ALMON, SHORES, INGRAM and COOK, JJ., concur.
STEAGALL, J., concurs in the result.
HOUSTON and KENNEDY, JJ., not sitting.